# THE NATIONAL EXCHANGE BANK *vs.* WILLIAM GAY.

Hartford Dist., March T., 1889. PARK, ·C. J., CARPENTER, PARDEE,
LOOMIS and BEARDSLEY, Js.

The defendant and others, stockholders of a joint stock manufacturing
company, in 1872, desiring to obtain loans from the plaintiff bank for
the company, gave a joint and several guaranty to the bank for the
"full, prompt, and ultimate" payment of all loans made by the bank
to the company, not to exceed $15,000 outstanding at any one time,
with a right at any time to terminate the obligation as to any further
loans by giving written notice to that effect. The company obtained
discounts at the bank until 1888, when it failed. The bank was organ-
ized as a national banking association under the act of Congress of
February 25th, 1863, by the terms of which its existence was limited
to twenty years from the date of the act, which act was in force when
the guaranty was given. Before the twenty years expired on the 24th
of February, 1883, the act of 1882 was passed, by which the bank, by
taking certain steps, could prolong its existence for a second term of
twenty years. These steps were taken in January, 1883, and the corpo-
rate existence of the bank was extended to 1903. The notes held by the
bank at the time of the failure of the company were renewals of notes
or parts of notes taken by the bank prior to February 25th, 1883. In
a suit on the guaranty it was held—

1. That the guarantors could not be regarded as sureties in the ordinary
sense, with the rights attaching to that relation, but were to be regarded
as the borrowers of the money.

2. That the bank remained the same corporation after it entered upon its
extended term as before, and was therefore the corporation that the
guarantors agreed to pay.

3. That as the notes taken by the bank after that time were renewals of
notes discounted before, they would come directly within the terms of
the guaranty, which secured the "full and ultimate" payment of all
loans.

[Argued March 15th—decided April 15th, 1889.]

ACTION on a joint and several guaranty for the payment
of loans made by the plaintiff bank to a joint stock manu-
facturing company of which the guarantors were stockhol-
ders; brought to the Superior Court in Hartford County.
The defendant filed an answer, the plaintiff replied, the de-
fendant demurred to the reply, and the case was reserved

upon the demurrer for the advice of this court. The guaranty, answer and reply are set out in the opinion.

*F. Chamberlin* and *C. E. Perkins*, in support of the demurrer.

1. It is well settled that sureties are favored both in law and equity, and have a right to stand upon the strict terms of their obligation, which is not to be extended by implication. Brandt on Suretyship, § 79; *Olmsted* v. *Olmsted*, 38 Conn., 309, 318; *Miller* v. *Stewart*, 9 Wheat., 680.

2. The law at the time of a surety's contract is presumed to be a part of it. Brandt on Suretyship, § 139; *Welch* v. *Seymour*, 28 Conn., 393; *People* v. *Pennock*, 60 N. York, 421; *Blair* v. *Perpetual Ins. Co.*, 10 Misso., 559; *Wilmington* v. *Horn*, 2 Harring., 190; *State* v. *Wayman*, 2 Gill & J., 254; *U. States* v. *Price*, 9 How., 91; *Oswald* v. *Mayor &c. of Berwick*, 5 H. L. Cases, 856; *Mayor &c. of Dartmouth* v. *Silly*, 7 Ell. & Bl., 97.

3. The precise question in the case has been often decided, and in accordance with our claim. *Bank of Washington* v. *Barrington*, 2 Pen. & Watts, 27; *Union Bank* v. *Ridgley*, 1 Har. & Gill, 324; *Thompson* v. *Young*, 2 Hammond, 334; *Grocers' Bank* v. *Kingman*, 16 Gray, 473.

4. There are many analogous cases holding the same doctrine. *Small* v. *Currie*, 5 DeG. M. & G., 141; *Wright* v. *Russell*, 2 W. Black., 934; *S. C.*, 3 Wils., 530; *Barker* v. *Parker*, 1 T. R., 287; *Strange* v. *Lee*, 3 East, 484; *Dance* v. *Girdler*, 1 Bos. & Pul. N. R., 34; *Simson* v. *Cooke*, 1 Bing., 452; *University of Cambridge* v. *Baldwin*, 3 Mees. & Wels., 580; *Backhouse* v. *Hall*, 6 Best & Smith, 507; *Bonar* v. *Mc-Donald*, 3 House of L. Cases, 226; *Oswald* v. *Mayor &c. of Berwick*, 1 Ell. & B., 275; *S. C.*, 3 id., 653; *Kitson* v. *Julian*, 4 id., 854; *Pybus* v. *Gibb*, 6 id., 902; *Regina* v. *Hall*, 1 Upp. Canada C. P., 406; *Conn. Mut. Life Ins. Co.* v. *Bowler*, 1 Holmes, 263; *Brown* v. *Lattimore*, 17 Cal., 93; *Governor* v. *Lagow*, 43 Ill., 134; *Same* v. *Bowman*, 44 id., 499; *State* v. *Roberts*, 68 Misso., 234; *Davis* v. *The People*, 1 Gilm., 409; *Prairie* v. *Jenkins*, 75 N. Car., 545; *Johnson* v. *Hacker*, 8

Heisk., 388; *Sage* v. *Strong*, 40 Wis., 575; *Chelmsford Co.* v. *Demarest*, 7 Gray, 1; *Trustees &c.* v. *Dean*, 130 Mass., 242, 246; *Welch* v. *Seymour*, 28 Conn., 387; *Miller* v. *Stewart*, 9 Wheat., 680; *U. States* v. *Kirkpatrick*, id., 720; *Smith* v. *U. States*, 2 Wall., 219, 284; Brandt on Suretyship, §§ 139, 140, 141; Parsons on Part., 331, and notes.

4. But the plaintiff says that, even if the defendant's liability as surety ceased February 24th, 1883, yet some of the claims existing at that date have not yet been paid, but the notes representing them have been renewed from time to time, and such renewals are now unpaid. But it is a well-settled principle of the law applicable to sureties, that giving time to the principal debtor discharges the surety. No reference to authorities is necessary to establish that point. The foundation of this rule, like that of the former one, is that such extension of time changes the original contract, and extends the liability of the surety without his consent. If this instrument had been a guaranty of one note, and upon its maturity the plaintiff had taken a renewal note, there can be no doubt but that the surety would have been discharged. But there can be no difference in principle between a guaranty of one note, and a guaranty of all the notes which may be discounted within a certain time. Whenever that time has arrived no new notes can be discounted, and whether there be one or more notes outstanding, the holder has no more right to renew several without the consent of the surety than he has to renew one, and if he does so he discharges him. Brandt on Suretyship, § 316; *Hubbard* v. *Gurney*, 64 N. York, 457; *Randall* v. *Lautenberger*, 5 N. E. Reporter, 777. To make a surety liable for renewals his liability should be clearly expressed in the guaranty. Even if the words are susceptible of two constructions, he is entitled to the most favorable one. In *Moorehead* v. *Duncan*, 82 Penn. St., 488, a bond was given for the payment of notes, or a renewal of them, and it was held to mean only a single renewal, and that another renewal discharged the surety. To say that if I guarantee the "ultimate" payment of a note, I thereby agree that the

creditor may, when it becomes due, renew and extend it for as long time as he pleases, without my knowledge or consent, would be a strained construction which this court would not put even on an ordinary contract. It may be suggested that as this guaranty provides that it may be terminated at any time by written notice, it is to be implied that it is to be in force until so revoked. But this also would be an addition to its terms by implication. The clause must have been put in merely from excess of caution, as without doubt a party can always revoke and terminate a guaranty of this kind as to future liabilities or advances. *Offord* v. *Davies*, 12 C. B. (N. S.), 748; *Jordan* v. *Dobbins*, 122 Mass., 168.

*A. P. Hyde* and *J. C. Parsons, contra.*

It is assumed by the defendant's counsel that the mere fact that the legal term of the corporate existence of this company might have been terminated on the 24th of February, 1883, necessarily put a limit to the contract made with them as the National Exchange Bank on that date. This conclusion is wholly unwarranted. The only limitation in the bond as to the liability of the signers, was that it might be ended at any time either of them saw fit to give written notice of its termination. This had no reference to the question how long the bank might be able to furnish the accommodations requested. No reference is made to the term of its corporate existence; but the bond simply provides that so long as the bank shall be able to furnish the discounts, the bondsmen will be responsible until they notify the bank of their unwillingness to be bound further. We are well aware that there are numerous decisions that where a contract of guarantee has been given to a firm or copartnership, and afterwards this firm has been changed or dissolved, the new firm cannot claim the benefit of the guarantee. But these cases are based upon the idea that a contract of guarantee was made with one party, and that another party is seeking to enforce it. But those decisions have no bearing upon a case like this. The act under which the

bank had its term of life extended, did not constitute a new party,—it merely gave an additional lease of life to the old corporation.

Suppose on the first day of January, 1883, the officers of the bank had been chosen for a year, can there be any doubt that they would have held their offices and be able to bind the bank after the 24th of February, 1883, in the same manner as though they had been elected after that date? The act of Congress expressly provides that upon the extension of its charter the bank " shall continue to be in all respects the identical association it was before the extension of its period of succession."

The only objection that can now be made, is that the bank was able to furnish these discounts longer than was expected. It is the same bank. The claim of the defendant is—You ought not to have furnished discounts after your term of life was extended. Our answer is—If you did not wish the discounts to be furnished longer, you should have given notice and that would have ended it.

In this state it is well settled that contracts of guarantee or suretyship are to be construed in the same manner as other contracts. *Hotchkiss* v. *Barnes*, 34 Conn., 27, 34. In construing a bond regard must be had to the intent of the parties. The nature of the duty and the character of the parties will be regarded as explanatory of their intent. *Strawbridge* v. *Balt. & Ohio R. R. Co.*, 14 Md., 360; *Detroit Sav. Bank* v. *Ziegler*, 49 Mich., 157; *Barclay* v. *Lucas*, 1 T. R., 291, *note*, was an action upon a bond in which it appeared that the plaintiff, a private banking house, had agreed to take a clerk into its service, and the bond in suit was conditioned for his fidelity in the service. While the clerk was so engaged a new partner was admitted; but it was held in that case as the bond was given as security to the house, the bondsmen were holden for the default of the clerk after a new partner had been added. In *Metcalf* v. *Bruin*, 12 East, 400, a bond was given to trustees to secure the faithful services of a clerk to the Globe Insurance Company, which was not a corporation, but the partners in the company

were subsequently changed. It was held that the bondsmen were holden for the default of the clerk while continuing in the employ of the insurance company, notwithstanding that the partners representing the company were changed from time to time. In *Foster* v. *Essex Bank*, 16 Mass., 245, the bank was incorporated for the term of twenty years. Before the term had expired a statute was passed continuing the life of the corporation three years, and giving them power during the three years of continued life to enforce any contracts made with the bank before the expiration of its original charter. This case was most elaborately argued by distinguished counsel, and the decision rendered by PARKER, CH. J. It was held that this extension of life with the enabling power to sue on previous contracts did not violate the obligation of any contract and was perfectly valid. In *Eastern Union Railway Co.* v. *Cochrane*, 9 Wels., Hurl. & G., 197, the defendant as surety executed a bond conditioned for the faithful services of a clerk to a railway company. While the services continued that company and another railway company were dissolved and united in one, by a statute which provided that all bonds and other contracts with the dissolved companies should enure to the benefit of the consolidated company, and the consolidated company should assume all the liabilities of the individual companies. It was held that the defendant was liable for breaches of the bond committed by the clerk after the union of the two companies. In *Exeter Bank* v. *Rogers*, 7 N. Hamp., 21, Rogers was appointed cashier of the bank, and the bond was given for his faithful performance of his duties while acting as such cashier. The bond was dated February 18th, 1809, and the act incorporating the bank provided that the corporation should continue from the first of January, 1804, until the expiration of twenty years then next following. In 1822 the legislature extended its charter for twenty years longer. Rogers continued cashier until 1830, when he became a defaulter to the bank after the period of its extension. It was held that his bondsmen were liable for his defalcations after the period of his extension. This case

clearly covers the present one. See also, *City National Bank* v. *Phelps*, 97 N. York, 44 ; *Coffee* v. *Bank of the State of Missouri*, 46 Misso., 140.

The court will notice further that the notes in suit are renewals of indebtedness existing before the extension of the charter. As such they are clearly covered by the bond. The word " ultimate " reveals the intention of the parties. " Ultimate payment " in connection with " full and prompt " payment, can have no other significance than this—" If the notes are not promptly paid in full as they severally mature, and you choose to renew them in whole or in part, we will see that in the end you are paid."

But apart from the words of the bond, the renewals of notes did not discharge the sureties. The renewals were but continuations of the original credit. They did not pay the original debt. If the bank owned a liability of the defendant to pay the notes in January, 1883, the ownership passed by operation of law, and it was an asset of the bank in January, 1889. *City Nat. Bank* v. *Phelps*, 86 N. York, 484, 491, 493.

Again, to hold the bondsmen in this case released from their liability would be inequitable. It is found that they were stockholders of the Delaney & Munson Manufacturing Co. It was merely an arrangement by which loans might be made for that company, which was in effect for themselves, upon their obligating themselves for the payment of the notes. There are none of the ordinary elements of a suretyship in the matter. They had a right to put an end to their liability for future loans, by simply giving written notice to that effect. But they chose not to do so. By this they consented that the obligation should continue in force, and remain, as it had from the first been, a request of the signers of the bond that the bank would make loans to the company on its application. There is not only no equity to be considered in their favor, but every consideration of equity is against them.

PARDEE, J. The plaintiff corporation was organized on

April 5th, 1864, under the act of Congress of February 25th, 1863. Under that law its existence would have terminated on February 24th, 1883. By an act of Congress passed July 12th, 1882, entitled an "Act to enable National Banking Associations to extend their corporate existence and for other purposes," it was enabled to, and did, extend its existence during twenty additional years.

On January 8th, 1872, the defendant, with others, executed a bond as follows:—

"*Know all men by these presents*, that, whereas the National Exchange Bank of Hartford, Connecticut, has discounted, and may hereafter discount, for the Delaney & Munson Manufacturing Company, (a corporation existing under the laws of the state of Connecticut, located and doing business in the town of Farmington,) promissory notes, drafts, and bills of exchange : Therefore we, James W. Delaney, George Dunham, Lucas Richards, Samuel Q. Porter, George Richards & Co., Augustus Ward, William Gay, Winthrop M. Wadsworth, and Samuel S. Cowles, for value received, jointly and severally guarantee to the said National Exchange Bank the full, prompt and ultimate payment of all promissory notes, drafts, bills of exchange, or other evidences of indebtedness which the said National Exchange Bank have discounted or may hereafter discount for the said Delaney & Munson Manufacturing Company to an amount not to exceed fifteen thousand dollars in all at any one time. And in case of non-payment we do hereby bind ourselves, our heirs, and executors, to pay the same on demand, with all costs and damages. It is, however, agreed and understood between the parties to this instrument that any one or all of the signers thereof may, at any time hereafter, give notice in writing to the president or cashier of the said National Exchange Bank, that such signer or signers of said bond will not be holden upon said bond for any liabilities created by said Delaney & Munson Manufacturing Company subsequently to the giving of said written notice, and that such signer or signers shall thereby and thereupon be released and discharged from any claim by

said bank upon said bond for any liability created as afore-said, after the giving of said written notice.   Dated at Farm-ington on this eighth day of January, A. D. 1872."

In a suit by the bank against William Gay, one of the sign-ers of the bond, the defendant by way of answer averred "that, at the time said bond was made, the obligee therein described was a corporation duly organized on the 5th day of April, 1864, under the banking laws of the United States, to continue as such national banking corporation until the close of business on the 24th day of February, 1883, but it had no power or right of succession or of corporate exis-tence for a longer period than twenty years from and after its said organization, to wit, after said 24th day of February, 1883."—Also "that the only consideration for said bond was such as might arise from time to time by the said obligees discounting notes and other evidences of indebtedness for the benefit of said Delaney & Munson Manufacturing Com-pany within such time as the said bond might continue in force, and that none of the notes described in the plaintiff's complaint were discounted by said obligee prior to February 25th, 1883, but were all discounted in 1887 and 1888, as specified in said complaint, and long after the expiration of the corporate existence of said obligee under the banking laws in force at the time of its organization as aforesaid or at the time of the making of said bond."

In reply the plaintiff averred "that the notes described in the complaint were discounted for the Delaney & Munson Manufacturing Company since February 24th, 1883; that from the date of said bond (January 8th, 1872) to the com-mencement of this suit, the plaintiffs have held at all times some notes, drafts, bills of exchange, or other evidences of indebtedness which they had discounted for said manufac-turing company, relying upon said bond as security therefor, and that all of the notes described in said complaint were renewals and extensions in whole or in part of loans and dis-counts made for said Delaney & Munson Manufacturing Company upon the faith of said bond before said 24th day of February, 1883; and that the defendant and the other sign-

ers of said bond were severally stockholders of said Delaney & Munson Manufacturing Company, and executed the same for the purpose of securing the plaintiffs for all discounts they should thereafter make for said company, and all the notes or commercial paper subsequently discounted by the plaintiffs, including the notes described in the complaint, were discounted by the plaintiffs in good faith and in full reliance on the security of said bond."

To this reply the defendant demurred, and the case is reserved on the demurrer for the advice of this court.

Courts, when called upon to construe contracts guaranteeing the faithful discharge of the duties of an office, adhere closely to the letter, for this reason, that the obligor has assumed a burden of responsibility solely for the benefit of another, without compensation or possibility of profit to himself, and therefore the law will add nothing to it by way of presumption.

In the case before us the defendant with others, desired to become a manufacturer, of course for pecuniary profit. For the purpose, among others, of putting a limit to individual responsibility for losses, they associated themselves under the statute as a joint stock corporation. Being unwilling individually to contribute the necessary capital from money in hand, they determined to borrow it from the plaintiff. For convenience in the transaction of the business the money was borrowed upon notes made by the corporation. To avoid the inconvenience of indorsements by several individuals upon each of a large number of original notes and the renewals thereof, the obligors made one comprehensive continuing contract of indorsement in the form of a guaranty under their respective hands and seals. In effect, therefore, the defendant borrowed money for himself and his associates; he received and used it for his and their profit; and still has it in possession. It is difficult therefore to perceive any distinction between his case and that of any other borrower; difficult to perceive any of the essential elements of a suretyship in his position; therefore difficult to see any reason why he should ask, or the court should

grant, the special protection of the law applicable to that relation.

It may well be presumed that obligors would desire to limit the time during which they would be bound for the faithful performance of the duties of an office by another. But, inasmuch as both morally and legally it is the duty of every man to repay money borrowed for his own use and profit, it must be the presumption that these obligors intended to do so; that they intended to pay it to the plaintiff, or even to such person or other corporation as should legally become the assignee of its right to receive.

There can be no presumption that they had any preference as to whether the plaintiff should lend money to the corporation at its and their request for the use and profit of themselves and their associates, before rather than after the extension of its corporate existence; it being in their power to terminate their liability at the moment when the use of borrowed money should cease to be profitable to themselves; no presumption of preference to pay before rather than after extension. Indeed, the presumption must be in favor of the longest credit as against a borrower who can pay when he pleases.

Again, the letter of their obligation has this, and no other limitation; namely, they guarantee the repayment of money, to a limited amount, which the plaintiff should thereafter lend to the corporation, reserving the right to terminate the contract at will.

The power which created the plaintiff put a limit to its existence; before that limit had been reached, while the plaintiff was in full corporate life, the creating power moved that limit farther into the future. The power which can create can prolong. It was not the substitution of one legal entity for another; it was not the change of a state into a national corporation; it was not even the restoration of a spent corporate life. The identical corporation which received the breath of life in 1863 has been in uninterrupted, unchanged existence to this present; having the same rights; bearing the same obligations. Its power to enforce payment

upon its debtors was not affected by the fact that the time of first limitation had expired. Its title to real estate needed no re-enforcement by additional conveyances. It is therefore the corporation to which the obligors bound themselves to repay.

The court would jar the foundation upon which law stands, namely, the common sense of mankind as to what is right or wrong, if it should say that the defendant need not repay borrowed money for the reason that he took it from the plaintiff after it had entered the period of its prolonged existence.

Moreover, in the second paragraph of its reply, the plaintiff alleges that the notes upon which it asks a judgment are renewals in full, or extensions of such part as has not been paid, of notes made before the expiration of the limit first put upon its existence. To this the defendant demurred, averring that the allegation is immaterial, for the reason that if, after the day of expiration of the first limit to the corporate life of the plaintiff, it renewed any notes, such renewal would of itself discharge the defendant from liability. But by the bond the obligors guaranteed "the full, prompt, and ultimate payment of all promissory notes," etc. Beyond doubt it was in the contemplation of both parties that the relation of borrower and lender thus formally established would continue during a long period of time—for years. In fact, so far forth as the defendant is concerned, it continued during sixteen years. Beyond doubt, too, the notes in suit are accommodation notes; that is, the maker is the corporation; the payer is a stockholder and an obligor upon the bond; not representing any business. But, however that may be, it is beyond doubt that both parties contemplated that, although the lending by the plaintiff would be in form upon the comparatively short time customary to a bank, yet in fact the borrower would long continue to be such by renewal or extension. Therefore the bond is framed to meet such contingency.

To guarantee "full and prompt" payment would meet the case of a note, on usual bank time, actually to be paid in

full at maturity. To guarantee, in addition to "full and prompt" payment, the "ultimate" payment, can have no other meaning than that the obligor should continue bound to the end of all substitutions, renewals, and extensions.

The Superior Court is advised that the reply to the answer is sufficient.

In this opinion the other judges concurred.