PITTSBURGH, C., C. & ST. L. RY. CO. et al. v. KEOKUK & H. BRIDGE CO.

(Circuit Court of Appeals, Seventh Circuit. April 9, 1901.)

No. 729.

1. EQUITY—BILL FOR REVIEW—NEWLY-DISCOVERED EVIDENCE—LEAVE OF COURT.
    A bill of review for newly-discovered evidence should be brought in the court in which the decrees sought to be reviewed were rendered, leave therefor being first obtained from the supreme court and circuit court of appeals, by which they were affirmed.

2. SAME—FRAUD.

A bill of review, on the ground of fraud in obtaining the decrees sought to be reviewed, should show how complainants were put on inquiry as to the alleged facts; by what means they learned them; or why the discovery, by the exercise of ordinary prudence, might not have been made when the litigation was begun.

3. BRIDGE COMPANY—SUITS AGAINST RAILROADS FOR TOLLS—DECREES—CONCLUSIVENESS.

A contract with a bridge company gave railroad companies the right to use the bridge in perpetuity on their agreement to pay certain monthly tolls, and to pay each one-fourth of the deficiency for every period of six months in which the tolls for freight traffic fell below $40,000. The bridge company, however, was not to contract with any other person or company at a less rate than was therein provided for without the consent of the railroad companies. Under this contract suits were brought by the bridge company for deficiencies in tolls, and the decrees therein determined that reduced rates then charged by the bridge company constituted no defense, and that charges then made for counsel fees were also proper. *Held*, that the decrees were not conclusive as to the rights in the same respects, of the same defendants, in a subsequent suit by the bridge company on the same contract, for deficiencies covering a distinct period of time, within which the facts determinative of the attitude and rights of the parties may or may not have been the same.

4. SAME—EVIDENCE—DEFENSE.

In a suit on the contract for deficiencies in tolls, defendants claimed a release from liability by reason of complainants' reductions in the stipulated rates. On this question individual officers of defendants testified that they each had no information of the reduction, but the proof showed, on the other hand, that during the long period in question these reductions had been submitted to agents and experts of defendants for examination, and that they were not only reasonable, but necessary to prevent diversion of traffic and income. *Held*, in view of the well-known course of business, and the certainty that changes of rates over one line or system of railroads would soon be felt or known on other lines, and especially in view of the direct interest of defendants in the rates charged, that they must have known thereof, and that their failure to object before suit imported consent, and hence the reductions were no defense.

5. SAME—RELEASE FROM LIABILITY AS SURETY OR GUARANTOR—RIGHT TO ASSERT.

While the purpose of the parties expressed in the contract was to provide a fund for the payment of interest on bonds which it was contemplated should be issued by the bridge company, the railroad companies had a direct interest in the construction and operation of the bridge; and hence, in a suit under the contract for deficiencies in tolls, from liability for which they claimed they had been released by reason of the bridge company's reduction in the stipulated rates, they could not assert the right of a surety or guarantor to insist that any departure from the letter of the contract by the bridge company, however slight, and even though beneficial, had worked their discharge.

6. SAME—CONTRACT WITH RAILROAD COMPANY—CONSTRUCTION—RECOVERY OF EXPENSES OF LITIGATION.

An amendment to the contract further stipulated that the revenues from all sources since the opening of the bridge should be first applied to the payment of interest on the bonded debt, and specified dividends on the capital stock of the bridge company, and the cost of "repairs, maintenance, and all expenses connected therewith, the surplus to belong to the railroad companies parties hereto." *Held*, that the obligations of the railroad companies were not enlarged or modified by the amendment, and hence, in a suit for deficiencies in tolls, they could not be made to pay fees paid by the bridge company to attorneys and one of its officers, and other expenses incurred in the litigation.

7. SAME—EVIDENCE—MONTHLY REPORTS OF RAILROADS.

In a suit for deficiencies in tolls, semiannual statements, made up from the monthly reports of the railroads using the bridge, were competent evidence thereof; their reliability as showing the actual receipts of the bridge company from the railroads affecting their weight only.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

This is a sequel to prior suits between the same parties. By two decrees of the circuit court of the United States for the Northern district of Illinois, the first rendered on January 21, 1884, and affirmed by the supreme court (131 U. S. 371, 9 Sup. Ct. 770, 33 L. Ed. 157), and the second rendered on December 9, 1892, and affirmed by this court under the direction of the supreme court (46 U. S. App. 530, 15 C. C. A. 184, 68 Fed. 19; 155 U. S. 156, 15 Sup. Ct. 42, 39 L. Ed. 106), the appellants were adjudged to pay, and it appears have paid, to the bridge company, for deficiencies in tolls for the use of the bridge under the contract of January 19, 1869, as modified on June 6 and November 25, 1871, the sums of $153,791.29 and $143,367.65, respectively, for the periods from September 1, 1874, to March 1, 1883, and from the latter date until March 1, 1892, in addition to the sum of $36,651.17 paid voluntarily before the first-named date. This suit was brought by the appellants, the Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company (called the Pittsburgh Company), and the Pennsylvania Railroad Company, in the circuit court of the United States for the Southern district of Illinois, for the purpose of recovering of the appellee, the bridge company, the money so paid upon the decrees or a part thereof, on the ground of alleged fraud and newly-discovered evidence. The original bill was brought in February, 1895, and, not denying or questioning the right of the bridge company to change the rate of charges or tolls without the consent of the railroad companies, alleged payment of "the sum of $26,000 or thereabouts in excess of the amount which said bridge company was justly, equitably, and legally entitled to have or receive." The amended bill was filed on September 22, 1896. The substance of the averments of fraud is that the bridge company never requested the complainants, or either of them, to consent to any change in the schedule of rates or tolls in the contracts specified, nor notified the Columbus, Chicago & Indiana Central Railway Company (called Columbus Company), or the complainants, or either of them, of any contemplated or desired change of the schedule, or that any such change had at any time become necessary or prudent; that the complainants, at all times heretofore, relying upon the good faith and integrity of the bridge company to charge and collect the tolls and rates specified in the contract and amendments, have understood and believed that the semiannual statements of account rendered showed correctly the items and amounts of receipts by the bridge company for traffic over the bridge, based upon charges or tolls collected in full accordance with the contract and amendments, but that, as they are now informed, believe, and charge, the defendant from time to time fraudulently, and without notice to, and without the consent of, the Columbus Company, and without notice to, and without the consent of, the complainants, or either of them, reduced its rates of charges and tolls, and that the semiannual statements are not based upon the contract rates, but upon much smaller rates, whereby the deficiencies to be made up have been caused, or have been made much larger than if the stipulated rates had been collected; that the statements were also made up upon the false theory that the railway companies, parties to the agreement, had guarantied the receipts of the bridge company from all sources, over and above the cost of operation and maintenance, to equal $40,000 for each six months, whereas, in fact, the guaranty was only that the receipts from freight traffic should equal or net said bridge company the sum of forty thousand dollars semiannually; that in the proceedings in either of the causes in which the decrees against the appellants were entered no question of the basis upon which the semiannual statements had been made was raised or suggested; that the appellants, reposing full confidence in the bridge company, took no thought or action beyond verifying the clerical accuracy of the state-

ments as compared with the books of the company, and, having no thought or information that the contract rates had been modified, were misled and defrauded; that they did not discover the wrong and fraud until recently, and after the second decree was rendered; and that by reasonable diligence they could not have known the new matters and things set forth in time to have used them in said cause "prior to the hearing thereof, and rendition and affirmance of said decree." A demurrer was filed, but by agreement it was withdrawn, and an answer and cross bill filed, the purpose of the latter being to recover of the appellants their share of the deficiencies in tolls accrued since the last decree. The answer, besides denying all allegations of concealment and misrepresentation, and want of notice to the appellants, sets out the pleadings, proceedings, and decrees in the prior suits, for the purpose of showing what was thereby adjudged. Further amendments made to the pleadings of each party need not be stated.

The following provisions of the bridge contract and amendments are pertinent to the present questions:

Original contract of January 19, 1869: "The rates for transportation of freight across said bridge shall be as per Schedule A, hereto attached and made part hereof, and paid for severally by each of the railroad companies transporting the same. The moneys for the use of said bridge shall be paid on the tenth day of each month to the party of the fifth part. In case the party of the fifth part (the bridge company) allows any other railway company than those named herein to use said bridge, it shall furnish to the parties of the other parts monthly statements of the freight tonnage transported by said companies, and it is agreed that, if any other railroad company is authorized to transport across said bridge at lower rates than herein stipulated for, such permission shall, of itself, operate to reduce the rates to be paid to the parties hereto so as to correspond with such lower rates."

Schedule A: "The railroad tonnage of all parties over said bridge for each year, from the first day of January to the thirty-first day of December, inclusive, shall be ascertained. * * * Nor shall the aggregate net earnings from freight in any one year fall below the sum of eighty thousand dollars (80,000) to the said party of the fifth part. And in case the said named sum is not reached at the end of any year under the schedule rate, then the parties of the first, second, third, and fourth parts shall make up to the party of the fifth part such deficiency, each of the said parties, for itself and not for the others, paying said deficiency in proportion to the tonnage it has passed over said bridge, each being responsible only for itself, and not for the others; provided, further, that, during the next or any subsequent year following such deficiency, the rates may be increased at the option of the railway companies hereto; and provided, further, that the party of the fifth part shall not contract with any person or company for the transportation of freight or passengers at a less rate than herein provided for without the consent of the railway companies hereto. No increase of tonnage shall cause a decrease in the aggregate annual revenue from freight. * * * At the end of each year the accounts shall be adjusted, so that the total payments for the year will amount to the sum due, according to the rate above provided for."

Amendment of June 6, 1871: "The following modifications in the original contract between the parties hereto, dated January 19, 1869, for the construction and use of the bridge at Keokuk, are hereby agreed to: First. Instead of the schedule of tolls named therein the following shall be charged: * * * Second. Instead of the railway companies parties to the said contract making good any sum necessary to net the bridge company from railway freight traffic the sum of eighty thousand dollars per annum, pro rata, in proportion to the tonnage passed over the bridge by each railway company, it is agreed that the deficiency, if any, necessary to be paid, in order to produce to the bridge company at the rate of eighty thousand dollars per annum from railway freight traffic, shall be made good by each of the four railway companies hereto, to wit, the Toledo, Wabash and Western, the Toledo, Peoria and Warsaw, the Des Moines Valley, and the Columbus, Chicago and Indiana Central Railway Companies, by each for itself, and not for the others, paying one-fourth part of the deficiency, if any. * * * "

Amendment of November 25, 1871: "And it is further stipulated and

agreed by, to, and with the parties hereto, in the manner as hereinafter set forth, that these presents, when executed by the said parties, be and become **a** part of the modified contract, bearing date the sixth day of June, one thousand eight hundred and seventy-one, and also, in addition thereof, it become a part of the original contract bearing date the nineteenth day of January, one thousand eight hundred and sixty-nine, the foregoing and following being subjoined thereto by the parties hereto as between themselves. And it is further stipulated and agreed that' the net revenues from all sources of the said bridge company since the day of its said bridge being opened for traffic, after payment for repairs, maintenance, and all the expenses connected therewith, including reasonable cost for operating the bridge and approaches thereto, shall in the first instance thereafter be applied by said bridge company to the payment of the interest on one million dollars of mortgage bonds issued by said bridge company, and thereafter, provided any advances made by the railroad companies parties hereto towards paying the bonded interest shall have been first repaid as hereinafter recited, said net revenues shall be applied to the payment of dividends upon the capital stock of said bridge company, to wit, one million of capital stock, said dividends not to exceed in any one year eight per centum; and when the revenues as aforesaid are sufficient to make the said payments, to wit, the interest and dividends as aforesaid, the tolls upon the railway passengers and freights shall be from time to time reduced, so that the net revenues from all sources shall never exceed the sum necessary to produce the interest and dividends as aforesaid; and any net revenues in excess of said sum shall belong to the railway companies parties hereto, to be divided among them in proportion to the sums they may have, respectively, paid towards the fund necessary to pay the bonded interest. * * * And it is further agreed by the parties hereto that any payments made by the railroad companies hereto, under the provisions of the previous contracts before mentioned, towards making up the sum necessary to meet the bonded interest of the bridge company, the obligation to do which is herewith affirmed, said payments are to be considered as advances, to be repaid out of the first surplus revenues of the bridge company after payment of the bonded interest and expenses as aforesaid, and before any dividends are made upon the capital stock. * * * *"

The appellants, the Pittsburgh and Pennsylvania Companies, did not in their own names execute the contract, but they became bound thereby through the signature of the Columbus Company, as explained in the opinions of the supreme court referred to. By the decree in this case the appellants took nothing, but upon the cross bill were adjudged to* pay the bridge company the further sum of $142,474.80, for deficiencies accrued to June 19, 1900, the date of the decree. Numerous errors are specified.

J. T. Brooks, George Willard, S. P. Shope, and J. C. Mathis, for appellants.

Henry S. Robbins and Perry Trumbull, for appellee.

Before WOODS, JENKINS, and GROSSCUP, Circuit Judges.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

The bill of the appellants, if intended as a bill for review on the ground of newly-discovered evidence, should have been brought in the court in which the decrees that it was sought to have reviewed were rendered; leave therefor being first obtained of the supreme court and of this court, by which the decrees had been affirmed. Southard v. Russell, 16 How. 547, 570, 14 L. Ed. 1052; Kingsbury v. Buckner, 134 U. S. 650, 671, 10 Sup. Ct. 638, 33 L. Ed. 1047; Bank v. Taylor, 9 U. S. App. 406, 447, 4 C. C. A. 55, 53 Fed. 854; Seymour v. White Co., 34 C. C. A. 240, 92 Fed. 115. As a bill for relief on the ground of fraud in the obtaining of the decrees it is

upon its face insufficient, and its defects are in no manner supplemented by the proofs. It is not shown how the appellants were put upon inquiry into the facts, by what means they learned them, nor why the discovery might not just as well have been made at the commencement of the litigation, if, in obedience to the dictates of ordinary prudence, inquiry had been then instituted. No concealment or misrepresentation is alleged. The semiannual statements did not profess or purport to be based on the schedule rates. The bringing of the suits was notice to the appellants to prepare for defense, and "if they took anything for granted it was at their own risk." Embry v. Palmer, 107 U. S. 3, 2 Sup. Ct. 25, 27 L. Ed. 346. Such relief as is sought, though the power to grant it extends to cases of accident and mistake, as was said in Brown v. Buena Vista Co., 95 U. S. 157, 24 L. Ed. 422, "is never given upon any ground of which the complainant, with proper care and diligence, could have availed himself in the proceeding at law." See, also, Avery v. U. S., 12 Wall. 304, 20 L. Ed. 405; Crim v. Handley, 94 U. S. 652, 24 L. Ed. 216. The rule as stated by Chief Justice Marshall in Insurance Co. v. Hodgson, 7 Cranch, 332, 336, 3 L. Ed. 362, 363, is "that any fact which clearly proves it to be against conscience to execute a judgment, and of which the injured party could not have availed himself in a court of law, or of which he might have availed himself in a court of law, but was prevented by fraud or accident, unmixed with any fault or negligence in himself or his agents, will justify an application to a court of chancery." The fraud alleged to be available must be extrinsic; that is to say, "not in the subject of the litigation, not in anything which was involved in the issues tried, but fraud practiced upon the party or upon the court, during the trial or in prosecuting the action, or in obtaining the judgment." U. S. v. Throckmorton, 98 U. S. 61, 25 L. Ed. 93; Marshall v. Holmes, 141 U. S. 589, 12 Sup. Ct. 62, 35 L. Ed. 870; Graver v. Faurot, 46 U. S. App. 268, 22 C. C. A. 156, 76 Fed. 257. Of course, one who seeks relief from a decree in equity must be likewise free from fault or negligence.

Touching the decree upon the cross bill, the contentions of the appellants are—First, that by reason of the reduction in the rates and tolls charged during the period covered by the decree they were released from all liability; and, second, that, if liability be conceded, the accounting reported by the master was based upon an erroneous theory, and improperly included charges for counsel fees and other expenses of the bridge company in this suit and in the suit which ended in the decree of December 9, 1892. The appellee insists that these matters were involved in and therefore finally determined between the parties by the decrees rendered in the prior suits. We are unable to see that that is so. Those decrees, of course, determined that the reduced rates theretofore charged were proper, or for some reason constituted no defense to those suits, and that the charges then made for counsel fees were also proper; but it does not follow that any question of the rightfulness of the rates and tolls collected since March 1, 1892, and of the items of account now disputed, is foreclosed. What was done before may have been done

with the approval of the railroad companies, while what has been done since the second decree may have been without their knowledge or against their protest. The suits, it is true, have all been between the same parties, and upon causes of action arising out of one and the same contract, and yet each has been upon a separate and distinct cause of action, covering a distinct period of time, within which the facts determinative of the attitude and rights of the parties may or may not have been the same. Cromwell v. Sac Co., 94 U. S. 351, 24 L. Ed. 195; Nesbit v. Riverside Dist., 144 U. S. 610, 12 Sup. Ct. 746, 36 L. Ed. 562; Bissell v. Spring Valley Tp., 124 U. S. 225, 8 Sup. Ct. 495, 31 L. Ed. 411. Of course, whatever was determined in the earlier suits, either expressly or by necessary implication, as that the appellants are in effect parties to and bound by the bridge contract and amendments, and their liability thereon unaffected by the eviction of the Pittsburgh Company from the possession of the railroad of the Columbus Company, must be considered as having been put at rest; but to extend the estoppel as proposed would, we think, be unreasonable and without precedent.

The contention of the appellants that, by reason of the rates and tolls charged during the period covered by the cross bill having been less than the stipulated rates, they are released from all liability for the deficiencies accruing during that period, seems to be without substantial merit in fact, whatever the proper construction of the contract. The idea of making a defense on that ground is an afterthought, disclosed first in the amended bill, which was not filed until near twenty months after the bringing of the suit, fifteen years after the bringing of the first suit against them by the bridge company, and twenty-two years after they first denied liability upon the contract. The proof is that from July 1, 1885, to February 1, 1889, a discount of 25 per cent. from schedule rates was allowed, and from the latter date to the time of the hearing a rebate of 15 per cent. had been allowed, and these deductions or discounts were shown upon returns submitted to agents and experts of the appellants for examination. In view of the well-known course of business, the certainty that any change of rates over one line or system of railroads will be very soon felt and known upon other lines, and especially in view of the direct interest of the appellants in the rates charged for crossing this bridge, it is impossible to believe that they were without knowledge of the rates charged; and this conclusion is not affected by the testimony of individual officers that they each had no such information. The interchange of business through a course of years necessarily carried to all concerned a knowledge of the rates being charged, and the long-continued failure of the appellants to object to the reduced rates imports consent. The reductions made are shown, without dispute, to have been not only reasonable, but necessary, to prevent the diversion of traffic and income. There is no ground whatever for the charge in the amended bill that the deficiencies were caused or enhanced by the reductions. The contrary is true.

The rules governing contracts of suretyship or guaranty are not applicable. While the purpose of the parties was to provide a fund

for the payment of interest upon the bonds which it was contem-
plated should be issued by the bridge company, the railroad com-
panies which entered into the contract had a direct interest in the
construction and operation of the bridge, and cannot assert the right
of a surety or guarantor to insist that any departure from the let-
ter of the contract by the bridge company, however slight, and even
though beneficial, has worked their discharge. Bank v. Gay, 57
Conn. 224, 17 Atl. 555, 4 L. R. A. 343; Richardson v. Draper,
87 N. Y. 337; Kernochan v. Murray, 111 N. Y. 306, 18 N. E.
868, 2 L. R. A. 183. By its charter—the act of congress under
which it was organized—the bridge company was authorized to
collect only reasonable tolls, and if the rates originally agreed upon
became unreasonable it became its duty to change them, and the
duty of the appellants to consent to the change, and, it being clear
that the changes made were reasonable and necessary, it ought
perhaps on that ground alone to be held that the liability of the
appellants was not affected by the reduction; but it is to be ob-
served that the Columbus Company, to whom as the representative
of the appellants the bridge company was under engagement to give
whatever notice was necessary, had gone out of existence, and the
appellants had repudiated the contract before the reductions in
rates were made; so that notice to the appellants, if required by
the contract, and a request for their consent to the changes pro-
posed, would have been useless, and the failure to give the notice
and to obtain the consent should therefore be of no consequence.

The objection that the decree should not have included the fees
paid to attorneys and an officer of the bridge company, and other
expenses incurred in the litigation, is, we think, well taken. The
clear effect of the original contract and first amendment was to bind
the appellants to make good to the bridge company one-fourth of
the deficiency of net income from "railroad freight traffic" for every
period of six months, if the amount fell below $40,000. There is
nothing in the second amendment to affect this obligation. That
amendment has reference to revenues from all sources, and provides
that after payment of interest upon the bonded debt and capital
stock of the bridge company, and the cost of "repairs, maintenance,
and all expenses connected therewith," the surplus "shall belong to
the railroad companies parties hereto." The phrase, "all expenses
connected therewith," it is clear, includes all expenses which must
be taken into account in determining "the net revenues from all
sources," and manifestly includes more than can be considered in
determining the "net earnings from freight in any one year," or for
any period of six months. For deficiencies in receipts from freight
traffic only did the railroad companies become responsible. That
obligation is expressly affirmed by the second amendment, but it is
not enlarged or in any way modified.

It is urged that the semiannual statements, made up from the
monthly reports of the railroads using the bridge, were not compe-
tent evidence of deficiencies under the contract; but the objection
is not sound. There has been no suggestion that the statements
do not show the actual receipts of the bridge company from the

railroads using the bridge. They were certainly competent for that purpose; and if it be true, as pointed out, that better means might have been employed to obtain true and reliable monthly reports, the fact is irrelevant, unless in the accounting the bridge company should be charged with what it ought to have received in addition to actual receipts; and even upon that theory the fact might affect the weight, but not the competency, of the evidence. The total of the items improperly charged seems to be $36,833.39, one-fourth of which, or $9,208.35, with a proper addition for interest, should be deducted from the decree, and, so reduced, the decree will be affirmed, each party paying one-half the costs of the appeal.