GALVESTON CHAMBER OF COMMERCE et al. v. RAILROAD COMMISSION OF TEXAS et al.

(Court of Civil Appeals of Texas. Austin. March 15, 1911. Rehearing Denied May 17, 1911.)

1. CARRIERS (§ 18*)—REGULATION OF RATES—LEGISLATIVE POWER — JUDICIAL SUPERVISION.

Rate-making is a legislative function; but the determination whether a rate is reasonable is a judicial function.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 20; Dec. Dig. § 18.*]

2. CARRIERS (§ 18*)—REGULATION OF RATES—LEGISLATIVE POWER.

The establishment of rates by the Railroad Commission, created by the Legislature under the power conferred by the Constitution and empowered by Rev. St. 1895, arts. 4562, 4564, and 4565, to correct abuses and fix rates which shall be deemed reasonable until found otherwise, in a direct action brought for that purpose in the district court of a designated county, is not final, but is subject to judicial review.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 20; Dec. Dig. § 18.*]

3. CARRIERS (§ 13*)—REGULATION—ESTABLISHMENT OF RATES—VALIDITY.

Rev. St. 1895, art. 4574, defining unjust discrimination as charging any person a greater or less compensation for any service rendered by a carrier than it charges any other person for a like and contemporaneous service, etc., limits the power of the Railroad Commission, empowered to correct abuses and prevent unjust discriminations, and the Commission, authorized to make rates which must be obeyed until set aside in a direct suit, may not make rates which are unjustly discriminatory and permit a carrier to charge one person a greater or less compensation for a service than it charges any other person for a like service, or to give undue preference to any particular person or locality.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 13.*]

4. CARRIERS (§ 13*) — REGULATION — ESTABLISHMENT OF RATES—VALIDITY.

The questions of what is a like and contemporaneous service and of what is undue and unreasonable preference, within Rev. St. 1895, art. 4574, prohibiting unjust discrimination, etc., are questions of fact, the determination of which is within the discretion of the Railroad Commission, to the extent of making any rate fixed by it a legal rate, until otherwise determined by the court.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 21–24; Dec. Dig. § 13.*]

5. JUDGMENT (§ 804*)—"JUDGMENT IN REM."

A "judgment in rem" is a judgment against a thing as contradistinguished from a judgment against a person or a judgment whereby a status is determined.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1428, 1429; Dec. Dig. § 804.*

For other definitions, see Words and Phrases, vol. 4, pp. 3845, 3846.]

6. JUDGMENT (§ 585*)—RES JUDICATA—JUDGMENT ESTABLISHING RAILROAD RATES.

A decision, in a suit to enjoin a preferential rate on cotton between designated points as established by the Railroad Commission, which denies relief on the ground that the rate is not unreasonable under the circumstances proved is not res judicata in a subsequent suit attacking the reasonableness of the rate under a material change in the conditions.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 585.*]

7. JUDGMENT (§ 585*)—RES JUDICATA.

Where two suits seek the same relief, but on a different state of facts, an adjudication in one is no bar to a recovery on the other.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1092–1097; Dec. Dig. § 585.*]

8. JUDGMENT (§ 666*) — RES JUDICATA — ESTOPPEL.

Under the rule that estoppel must be mutual, and a party not bound by a judgment cannot claim that another is estopped by it, the Railroad Commission may not rely on a decision adjudging that rates are reasonable under facts proved, rendered in a suit against the Commission, to defeat a subsequent action alleging the unreasonableness of the rates under changed conditions.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1180; Dec. Dig. § 666.*]

9. LIMITATION OF ACTIONS (§ 12*)—ACTIONS AGAINST THE STATE.

A suit against the Railroad Commission, to enjoin it from enforcing rates fixed by it, is a suit against the state, and is not barred by limitations, in the absence of statutes making limitations run against the state.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 53; Dec. Dig. 12.*]

10. LIMITATION OF ACTIONS (§ 12*)—ACTIONS AGAINST RAILROAD COMMISSION.

The duty of the Railroad Commission to make and enforce proper rules which prevent unjust discrimination is a continuing one, and limitations do not run in its favor, so as to bar an action to restrain it from enforcing its rules.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 53; Dec. Dig. § 12.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**11. LIMITATION OF ACTIONS (§ 12*)—ACTIONS AGAINST THE STATE.**

A suit against the Railroad Commission, to enjoin it from enforcing its orders, involves the public welfare, and is not barred by limitations, though the suit is brought by private citizens.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 53; Dec. Dig. § 12.*]

**12. CONSTITUTIONAL LAW (§ 92*) — VESTED RIGHTS — TRANSPORTATION — CHANGE OF RATES.**

That a system of railroad rates established by the Railroad Commission has prevailed for a long time, and that persons have invested money on the faith of its continuance, do not prevent the court from setting aside the rates as unreasonable, as against the objection that vested rights have been acquired, for citizens are conclusively presumed to know that rates are subject to modifications, and that rates must not be unreasonable.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 92.*]

**13. CARRIERS (§ 199*)—RATES—REASONABLENESS.**

The common law, prohibits a carrier from making unreasonable discriminations in rates as between different localities or individuals, and one charged a rate, not unreasonable per se, may complain on the ground that he has been discriminated against, on showing that he was charged a greater rate than the carrier charged another.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 902; Dec. Dig. § 199.*]

**14. CARRIERS (§ 12*) — RATES — ESTABLISHMENT—GENERAL RULES.**

In rate-making the unit of cost of service in moving freight is the cost per ton per mile, which cost decreases as the length of the haul increases; and hence, under like conditions, freight may be carried long distances at rates proportionately lower than short distances.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

**15. CARRIERS (§ 12*) — RATES — ESTABLISHMENT.**

In rate-making distance is the primary basis, and, other things being equal, the rate charged must be in proportion to the length of the haul.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

**16. CARRIERS (§ 13*) — RATES — ESTABLISHMENT.**

Group rates, to which the influence of mileage does not apply which are unjustly discriminatory are illegal, and such rates, though inherently unequal, must be so made as to lessen such inequality as far as possible.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 21–24; Dec. Dig. § 13.*]

**17. CARRIERS (§ 12*) — RATES — ESTABLISHMENT.**

In rate-making density of traffic is an important factor.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

**18. CARRIERS (§ 12*) — RATES — ESTABLISHMENT.**

In rate-making competition is an important and frequently a controlling factor, and a carrier must be allowed to meet competition, or otherwise it must abandon the business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

**19. CARRIERS (§ 12*) — RATES — ESTABLISHMENT BY RAILROAD COMMISSION.**

In establishing rates it is not permissible, in order to equalize commercial advantages, to deprive any place of its natural advantages, and a place is entitled to the benefits arising from its location, and the Railroad Commission, establishing rates, may not disregard natural advantages to bring about commercial equality.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

**20. CARRIERS (§ 18*) — RATES — ESTABLISHMENT—PROCEEDINGS TO PREVENT ENFORCEMENT.**

Where the petition, in a suit to enjoin the Railroad Commission from enforcing rates to Galveston, alleged that there was nothing in the local conditions affecting the shipment of goods into Galveston justifying the charging of any greater freight rate than applied between other points in the state for similar services, and that the excuse of the Railroad Commission in requiring higher freight rates to Galveston above the freight rates required of another city was to deprive Galveston, and the persons engaged in business there, of natural advantages, and to arbitrarily put the other city on a plane of commercial equality in the business of handling goods, evidence as to whether a lower rate to Galveston would be a sufficient charge was admissible as material to the issue.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

**21. EVIDENCE (§ 570*)—OPINION EVIDENCE— REASONABLENESS OF RATES.**

In a suit to enjoin the Railroad Commission from enforcing rates, a question asked a member of the Commission, as an expert, as to whether, in his opinion, a lower rate would be a sufficient charge was not objectionable as binding the Commission by the individual opinion of the member.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 570.*]

**22. CARRIERS (§ 13*)—REGULATIONS—RATES— REASONABLENESS.**

The Railroad Commission Act (Sayles' Ann. Civ. St. 1897, arts. 4561–4584), prohibiting discriminations in the rendition of a like and contemporaneous service, and any undue or unreasonable charge to any particular person or locality, etc., forbids discriminations which are undue and unreasonable, and a discrimination in a freight rate against any person or locality for a like and contemporaneous service is unjust and unreasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 21–24; Dec. Dig. § 13.*]

**23. CARRIERS (§ 13*) — RATES — VALIDITY — BURDEN OF PROOF.**

Under Rev. St. 1895, art. 4566, providing that the burden of proof shall rest on the party attacking the validity of rates established by the Railroad Commission, one suing to enjoin the Commission from enforcing its rates has the burden of showing that the rates are discriminatory against any person or locality for a like and contemporaneous service, and is therefore unreasonable and unjust.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 13.*]

**24. CARRIERS (§ 13*) — RATES — DISCRIMINATION—REASONABLENESS.**

In a suit to enjoin the Railroad Commission from enforcing rates because discriminatory against a locality, evidence *held* not to justify the discrimination on the ground of cost of construction, maintenance, and transportation, or otherwise, authorizing relief.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 23; Dec. Dig. § 13.*]

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**25. CARRIERS (§ 13*) — RATES — DISCRIMINATION—REASONABLENESS.**

Slight differences in a single item of cost does not justify a difference in freight rates.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 23; Dec. Dig. § 13.*]

**26. CARRIERS (§ 13*) — RATES — DISCRIMINATION—REASONABLENESS.**

Where freight rates compel cotton men at Galveston to pay on cotton concentrated there about 12½ cents per bale for delivery to shipside, in addition to the freight rate, while carriers are compelled to pay all expenses of delivery to shipside on cotton concentrated at Houston out of the same rate, an undue preference is given to cotton men in Houston and the rates should not be enforced.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 21–24; Dec. Dig. § 13.*]

**27. CARRIERS (§ 13*) — RATES — DISCRIMINATION—REASONABLENESS.**

Where carriers entering Galveston through Houston must, under rates fixed by the Railroad Commission, charge a higher rate to Galveston for all freight over certain distance, varying with different commodities, than are permitted for the same character of freight for like distance to Houston and between other points in common territory, the rates are discriminatory, unless special circumstances justify them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 21–24; Dec. Dig. § 13.*]

**28. CARRIERS (§ 12*) — RATES — REASONABLENESS—PRESUMPTIONS.**

The court, in a suit to enjoin the Railroad Commission from enforcing its rates, must assume that the rates fixed and applicable to the greater portion of the state are reasonable.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 20; Dec. Dig. § 12.*]

**29. CARRIERS (§ 12*)—RATES—REASONABLENESS.**

Where, in a suit to enjoin the Railroad Commission from enforcing rates fixed by it, there is no complaint as to the rates from the standpoint of revenue to the carriers, the court must assume that the rates are sufficiently high, if the present average is maintained, to furnish sufficient revenue, and where the differential rates complained of are abolished, and there is a lowering of rates, so as to make the same unjust to the carriers, the Commission may regulate rates, so as to give the carrier reasonable compensation without unjust discrimination against any person or locality.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

**30. CARRIERS (§ 13*)—RATES—REASONABLENESS.**

The fact that freight rates between designated points are too low does not justify a discrimination against one of the points in hauls over maximum distances, and the rates between the points must be increased.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 23; Dec. Dig. § 13.*]

Appeal from District Court, Travis County; Chas. A. Wilcox, Judge.

Action by the Galveston Chamber of Commerce and others against the Railroad Commission of Texas and others. From a judgment for defendants, plaintiffs appeal. Reversed and rendered.

Yancey Lewis and Nelson Phillips, for appellants. Jewel P. Lightfoot, Atty. Gen., James D. Walthall, Asst. Atty. Gen., Baker, Botts, Parker & Garwood, Andrews, Ball & Streetman, and Gregory, Batts & Brooks, for appellees.

JENKINS, J. The plaintiffs' petition alleged substantially:

(1) That the purpose of this suit is to enjoin and restrain the Railroad Commission of Texas from enforcing certain rules, rates, and orders of the Commission complained of.

(2) That the Galveston Chamber of Commerce is a corporation, having no capital stock, composed of persons engaged in business in the city of Galveston; that the other plaintiffs, except Eugene Bailey and A. P. Landers, are engaged in the wholesale business in said city, doing business with the interior of Texas, and that said Bailey and Landers are farmers, raising products in Texas and shipping them to Galveston.

(3) That Galveston is a seaport city, having a population of about 40,000, a number of whom are engaged in wholesale business, and others engaged in daily labor and other pursuits, directly and indirectly depending for support on the commercial business done in said city, and all of whom are injuriously affected by the rates complained of.

(4) That Houston is a city of about 70,000 inhabitants, who are similarly engaged and are active competitors of those who reside in Galveston, and are affected by the rates complained of.

(5) That many persons are engaged in the wholesale business in other towns in Texas, and are in active competition with the wholesale merchants of Galveston.

(6) That said Commission has adopted tariff classifications, known as class rates and commodity rates, and has divided the state into two divisions, known as "Common Point Territory" and "Differential Territory," and has fixed the rates to be charged upon each class and commodity in said respective territories; the petition particularly describing said territories and said classifications and said rates. That there are certain exceptions to said classifications and rates, which are immaterial, in so far as this case is concerned.

That said Commission has prescribed that the freight rates to Galveston and other points, not included in common point territory, should be made by adding to the rate from common point territory to Houston what is known as the differential, ranging from 7 cents per 100 pounds on class No. 1, to 2 cents per 100 pounds on class E. That the points principally affected by said rating are Galveston, Texas City, and Port Bolivar. That there exists water transportation between Houston and Galveston. That by reason of the competition of the cheaper water rates between Houston and Galveston, the

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

rates fixed by said Commission up to a certain distance are cheaper to or from Galveston than for the same distance to or from Houston, or for the same distance between any other points in said common point territory; that the rates for Galveston to or from certain other distances is the same as those to or from Houston for a like distance, or for a like distance between any other points in common point territory, and the rates to or from Galveston for certain other distances are greater than the rates to or from Houston for a like distance, or between any other points in common point territory for a like distance. The distances for which it is alleged that the freights are less, the same or greater than for corresponding distances from Houston, or between other common point territory, are set out as to each class.

(7) That commodity tariff No. 1e adopted by said Commission relates to cotton, in which the rate on cotton in common point territory is graded, according to distance, up to 160 miles, at which point it is fixed at 49 cents per 100 pounds, and no charge is made for distance in excess of 160 miles; and that the rate on cotton to Galveston, Texas City, and Port Bolivar, is made by adding 6 cents differential to the Houston rate. That by reason of said rate No. 1e the rate on cotton from all points in common point territory below 210 miles is less than the rate on cotton between Houston and other points in common point territory for a like distance, and on all points in excess of 210 miles the rate to Galveston is greater than for a like distance from Houston or between other points in common point territory the excess amounting at 210 miles, and for all distances over that, to 6 cents per 100 pounds, or 30 cents a bale. That rate No. 1e is, as to plaintiffs and as to all persons engaged in buying or selling cotton at any place in the interior of Texas, over 160 miles from Houston, or in Texas City, Port Bolivar, or Velasco, unjust and unreasonable, and gives an unreasonable preference and advantage to those engaged in the cotton business in Houston.

(8) That railroads are required by order of the Commission to charge the same rate for local delivery in Galveston as for shipside delivery. That the same is unjust, for the reason that all cotton shipped into Galveston is finally delivered to ships on the wharves for export, and that there are expenses incurred and paid by the railroads in making the shipside delivery which they do not incur in making local delivery, amounting to 12½ cents per bale.

(9) That under the Commission's said order cotton may be shipped to Houston from points 160 miles distant or over at 49 cents per 100 pounds, and there switched and unloaded at local yards or compresses and reloaded and shipped to shipside at the expense of the railroad, but the railroads are not allowed to unload cotton at local yards or compresses at Galveston and reload same and carry it to shipside at their expense, but such reloading and carrying to shipside in Galveston must be done at the expense of the cotton factor or buyer.

(10) Paragraphs 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19 of plaintiff's petition make specific allegations against the Commission's rate on cotton seed, cotton seed products, rice, bran and hulls, linseed cake and meal, wool, canned goods, cotton gins, compresses, and machinery pertaining to the same, pickles, sugar, molasses, cement, soap, and hides.

(11) Paragraph 21 complains of an alleged discrimination against Galveston in favor of Texas City.

(12) Paragraph 12 alleges that, as to each and all of the alleged discriminations, the service performed is in all respects a like and contemporaneous service, and that each of said orders in the respect complained of required the railway companies to charge, demand, and collect and receive from persons and firms shipping any of such commodities to or from Galveston "a greater compensation than it charges, demands, collects, or receives from other persons, firms, and corporations for doing a like and contemporaneous service"; and requires such railway company to give to Houston, as a locality, and to other points in Texas as localities, and to persons, firms, and corporations engaged in shipping such commodities between Houston and such other points, an undue and unreasonable preference and advantage, and to subject all such traffic to an undue and unreasonable prejudice and disadvantage, in violation of the express provisions of article 4574 of the Revised Statutes of 1895 of the state of Texas.

The petition concludes with a prayer for injunction.

### Appellees' Answer.

In addition to a general denial and general and special exceptions, defendants answered in substance:

(1) That the making of rates was a legislative, and not a judicial, function, and that rates for Texas railroads having been made by the Railroad Commission the same were binding on the courts.

(2) That the matters involved in this suit are res adjudicata by reason of the judgment heretofore rendered in the case of Ladd & Co. v. Railroad Commission of Texas.

(3) That plaintiffs' cause of action, if any they ever had, is barred by the statute of four years' limitations. Appellees' answer also raises the following issues, which are presented in their brief:

(4) That by reason of expenditures incurred by the railroads and citizens of Houston, in reliance on the rates, rules, and regulations established by the Commission, the ap-

pellants are estopped by their laches from now insisting on a change in such rates, rules, and regulations to the detriment of said railroads and others.

(5) That appellants cannot legally complain of any rates established by the Commission, unless said rates are unreasonable and unjust per se.

(6) That appellants have no legal ground of complaint, unless they are directly injuriously affected by the rates established by the Commission.

(7) That the quantum of proof required by the statute on the part of appellants is that clear and satisfactory evidence, known in legal parlance as proof beyond a reasonable doubt.

(8) That the service of the railroads between Houston and Galveston is not a like service as that for the same distance in the interior, and will therefore justify higher rates.

(9) That whatever seeming inequalities there may be in the rates involved, the same arises from the group system, which is necessary to provide adequate revenue to the roads and do justice to shippers and producers.

(10) That, taking into consideration the lower rates accorded to Galveston for certain distances, as well as the higher rates for other distances, the rates, rules, and regulations established by the Commission do not, as a matter of fact, constitute a discrimination against Galveston.

### Appellants' Rejoinder.

In reply to the plea of res adjudicata and laches on the part of the appellees and to the plea of limitation, appellants alleged that none of the parties to this suit were parties to the suit of Ladd & Co. v. Commission; that the rates complained of in that suit were not the rates complained of in this suit; that great changes have taken place in Galveston and elsewhere in the state since said suit was tried, particularly as to the port of Galveston, its railway connections, and the extension of the cotton area in Texas; that no one could have been misled by any supposed laches on the part of appellants, inasmuch as the Chamber of Commerce of that city, its wholesale merchants, and its business men, have persistently and consistently at all times since the trial of said suit protested against the differential and the rates and regulations of the Commission, in so far as they affected Galveston, to the Commission and the Legislature, and through the public press. The appellants also alleged the minority of many of the citizens of Galveston, and the oft-occurring births, deaths, marriages, and divorces of parties residing in Galveston, within the last four years.

### Result of the Suit.

On December 29, 1909, the parties announced ready for trial and submitted the matters of fact, as well as of law, to the court. The court overruled the demurrer of the defendants, and also the demurrers of the plaintiffs. On January 29, 1910, the court rendered judgment for the defendants, and denied the plaintiffs the relief prayed for, to which action of the court the plaintiffs excepted and gave notice of appeal, and, having perfected their said appeal, the case is now before us upon the appellants' assignments of error and appellees' cross-assignments.

The court being requested to file its findings of fact and conclusions of law, filed originally 60 findings of fact and subsequently, at the request of appellants, filed 6 additional statements of facts, not in the form requested by appellants, but in a modified form, and refused 5 other findings of fact requested by appellants. Appellants filed 87 assignments of error, the most of which are insisted upon in an able brief of 254 pages, filed by appellants, and are combated in the very able brief of 203 pages on the part of appellees. Appellees filed 9 cross-assignments, to which appellants replied in a supplemental brief of 43 pages. The length of these briefs is not mentioned by way of complaint; they consist, for the major part, of able arguments by which this court has been greatly aided. The statement of facts herein comprises 1,016 typewritten pages, and the record consists of 244 pages, and the case could not have been properly presented to this court in briefs of ordinary length; nor can we make an intelligent statement of the case and dispose of the same in an opinion of ordinary length. The trial court filed 66 findings of fact, in most of which we concur. These findings covered each schedule complained of, but in our view of this case it is not necessary to go so minutely into details.

### Findings of Fact.

We make the following findings of fact:

(1) Galveston is a seaport city, doing an export, import, wholesale, and cotton business.

(2) Houston is situated on Buffalo bayou, a navigable watercourse for 58 miles in the interior from Galveston, and does a wholesale and cotton business.

(3) Seven railroads enter Galveston and freight over several other roads reach Galveston over the Gulf, Colorado & Santa Fé. The east Texas line of the Gulf, Colorado & Santa Fé Road reaches Galveston over the Gulf & Interstate Railway. All of said roads, except the Gulf, Colorado & Santa Fé on its main line and the Gulf & Interstate, pass through Houston to reach Galveston. The Gulf, Colorado & Santa Fé has a branch line from Galveston to Houston. It is about the same distance to Houston over the Gulf, Colorado & Santa Fé road from all points on its main line as it is to Galveston. All shipments to Galveston over the main line of the Gulf, Colorado & Santa Fé Road, and over

its east Texas line, whether originating on said road or on other roads, reach Galveston at a less mileage than they would if they went through Houston by its branch from Alvin.

(4) Houston is reached by 12 railroads.

(5) All of the state of Texas lying south of the Amarillo division of the Rock Island & Gulf Railway, including Amarillo, and east of and including a line drawn from Amarillo via Big Springs, San Angelo, Brady, Llano, San Antonio, Laredo, on the International & Great Northern Railroad, Alice and Corpus Christi, is defined by the Commission as common point territory, except that part of the St. Louis, Brownsville & Mexico Railway south of Sinton, and the Texas & Mexican railway. But Velasco, Galveston, Texas City, and Port Bolivar are excluded from common point territory, and are in what is commonly known as the Galveston differential territory.

(6) In common point territory the rate on each class of freight is fixed according to certain distances, up to a maximum distance, beyond which no charge is made for distance, and that the rate to Galveston, Texas City, Port Bolivar, and Velasco, on all distances less than certain maximum distances, is fixed on the mileage, and over certain maximum distances said rate is determined by adding certain fixed differentials to the Houston rate, as more particularly shown by the tables hereinafter set out.

(7) By reason of this method of rate making up to certain distances, the rate to Galveston is less than to Houston for like distances; for certain distances the rate to Galveston is the same as that to Houston; and for certain distances the rate to Galveston is greater than for a like distance to Houston, as shown by said tables.

(8) By reason of water competition between Houston and Galveston, the rates are lower between these two points than between any other points of like distance in Texas.

(9) The differential between Houston and Galveston, with the exception of that on cotton, is lower than the local rates between these points. Below is shown the local rates on the top line and the differential on the lower line:

| Class | 1 | 2 | 3 | 4 | 5 | A | B | C | D | E |
|---|---|---|---|---|---|---|---|---|---|---|
| | 20 | 18 | 15 | 16 | 12 | 12 | 11 | 9 | 8 | 5 |
| | 7 | 6 | 5 | 5 | 3 | 3 | 3 | 2 | 2 | 2 |

(10) If there was no water transportation between Houston and Galveston, and the rates between these points were the same as between common point territory, such rates per 100 pounds to and from Galveston on class 1 would be as shown below, as compared with present rates under the differential system; the present rate under the differential being shown by the upper lines, and the rates as they would be, if Galveston was common point territory, without water transportation, being shown by the lower line:

| 100 miles | 150 miles | 200 miles | 250 miles | 300 miles. |
|---|---|---|---|---|
| 35 | 51 | 65 | 78 | 87 |
| 44 | 58 | 70 | 80 | 80 |

(11) If Galveston was allowed the cheaper local rates by reason of water transportation between Galveston and Houston, and was allowed common point rates in all other respects, the rates as compared with the present differential rates on class 1 per 100 pounds would be as shown below; the upper line showing the present rates, and the lower line showing the rates as they would be under this system:

| 100 miles | 150 miles | 200 miles | 250 miles | 300 miles. |
|---|---|---|---|---|
| 35 | 51 | 65 | 78 | 87 |
| 34 | 48 | 60 | 70 | 70 |

In either event, the rate to or from Galveston would be the same for all distances 250 miles and over; this being the case now in all common point territory.

(12) If Galveston was a common point and no allowance was made for cheaper water rates between Houston and Galveston, its cotton rates, as compared with its present cotton rates, would be as shown below; the present rates being shown by the upper line; the rates as they thus would be being shown by the lower line:

| 100 miles | 160 miles | 200 miles and over. |
|---|---|---|
| 29 | 49 | 55 |
| 40 | 49 | 49 |

(13) Under the present rates cotton can be shipped a distance of 160 miles and over to Houston, unloaded in local yards or compresses, reloaded and delivered at shipside at Galveston for 6 cents, making a total of 55 cents; the railroads being required to pay the unloading, reloading, and terminal charges at Galveston. The rate on through shipments, 160 miles and over, from Houston to local yards or compresses at Galveston is 55 cents, but the parties at Galveston are required to pay the terminal expenses of delivery at shipside, which amounts to 2 cents per 100 pounds, thus giving cotton concentrated at Houston an advantage of 10 cents per bale over cotton concentrated at Galveston.

(14) Practically all cotton shipped to either Houston or Galveston is ultimately delivered at shipside for export. About two-thirds of the Texas cotton crop is raised more than 160 miles from Houston. Practically all of the cotton crop of Texas and part of the Oklahoma crop is exported through the port of Galveston. The cotton crop of Texas in 1906 was 4,474,206 bales; in 1907 it was 2,300,179 bales; in 1908 it was 3,814,485 bales. The evidence does not show the amount of the Texas crop later than 1908.

(15) The cost per ton per mile for moving freight between Houston and Galveston is

not greater than for a like service between other points for a like distance.

(16) The following table shows the tariff rates adopted by the Commission as to class No. 1. H indicates the rate in cents per 100 pounds to or from Houston, G to or from Galveston, D' difference in favor of Galveston, D'' the difference against Galveston:

| Distance in Miles | H | G | D' | D'' |
|---|---|---|---|---|
| 10 | 13 | | | |
| 11 and 12 | 14 | | | |
| 13 to 15 | 15 | | | |
| 16 to 18 | 16 | | | |
| 19 to 21 | 17 | | | |
| 22 to 24 | 18 | | | |
| 25 to 27 | 19 | | | |
| 28 to 30 | 20 | | | |
| 31 to 33 | 21 | | | |
| 34 to 36 | 22 | | | |
| 37 to 39 | 23 | | | |
| 40 to 42 | 24 | | | |
| 43 to 45 | 25 | | | |
| 46 to 48 | 26 | | | |
| 49 to 51 | 27 | | | |
| 52 to 54 | 28 | | | |
| 55 to 57 | 29 | | | |
| 58 | 30 | 20 | | 10 |
| 59 to 60 | 30 | 21 | 9 | |
| 61 to 63 | 31 | 22 | 9 | |
| 64 to 66 | 32 | 23 | 9 | |
| 67 to 69 | 33 | 24 | 9 | |
| 70 to 72 | 34 | 25 | 9 | |
| 73 to 75 | 35 | 26 | 9 | |
| 76 to 78 | 36 | 27 | 9 | |
| 79 to 81 | 37 | 28 | 9 | |
| 82 to 84 | 38 | 29 | 9 | |
| 85 to 87 | 39 | 30 | 9 | |
| 88 to 90 | 40 | 31 | 9 | |
| 91 to 93 | 41 | 32 | 9 | |
| 94 to 96 | 42 | 33 | 9 | |
| 97 to 99 | 43 | 34 | 9 | |
| 100 to 102 | 44 | 35 | 9 | |
| 103 to 105 | 45 | 36 | 9 | |
| 106 to 108 | 46 | 37 | 9 | |
| 109 to 111 | 47 | 38 | 9 | |
| 112 to 114 | 48 | 39 | 9 | |
| 115 to 117 | 49 | 40 | 9 | |
| 118 to 120 | 50 | 41 | 9 | |
| 121 to 123 | 51 | 42 | 9 | |
| 124 | 51 | 43 | 8 | |
| 125 to 126 | 52 | 43 | 9 | |
| 127 to 128 | 52 | 44 | 8 | |
| 129 | 53 | 44 | 9 | |
| 130 to 132 | 53 | 45 | 8 | |
| 133 to 135 | 54 | 46 | 8 | |
| 136 | 54 | 47 | 7 | |
| 137 to 138 | 55 | 47 | 8 | |
| 139 to 140 | 55 | 48 | 7 | |
| 141 | 56 | 48 | 8 | |
| 142 to 144 | 56 | 49 | 7 | |
| 145 to 147 | 57 | 50 | 7 | |
| 148 | 57 | 51 | 6 | |
| 149 to 150 | 58 | 51 | 7 | |
| 151 to 152 | 58 | 52 | 6 | |
| 153 | 59 | 52 | 7 | |
| 154 to 156 | 59 | 53 | 6 | |
| 157 to 159 | 60 | 54 | 6 | |
| 160 | 60 | 55 | 5 | |
| 161 to 162 | 61 | 55 | 6 | |
| 163 to 164 | 61 | 56 | 5 | |
| 165 | 62 | 56 | 6 | |
| 166 to 168 | 62 | 57 | 5 | |
| 169 to 171 | 63 | 58 | 5 | |
| 172 | 63 | 58 | 5 | |
| 173 to 175 | 64 | 59 | 5 | |
| 176 | 64 | 59 | 5 | |
| 177 to 179 | 65 | 60 | 5 | |
| 180 | 66 | 60 | 5 | |
| 181 to 183 | 66 | 61 | 5 | |
| 184 | 66 | 61 | 5 | |
| 185 to 187 | 67 | 62 | 5 | |
| 188 | 67 | 62 | 5 | |
| 189 to 191 | 68 | 63 | 5 | |
| 192 | 68 | 63 | 5 | |
| 193 to 195 | 69 | 64 | 5 | |
| 196 | 69 | 64 | 5 | |
| 197 to 199 | 70 | 65 | 5 | |
| 200 | 70 | 65 | 5 | |
| 201 to 203 | 71 | 66 | 5 | |
| 204 | 71 | 66 | 5 | |
| 205 | 71 | 67 | 4 | |
| 206 to 208 | 72 | 67 | 5 | |
| 209 to 210 | 72 | 68 | 4 | |
| 211 to 212 | 73 | 68 | 5 | |
| 213 to 215 | 73 | 69 | 4 | |
| 216 | 74 | 69 | 5 | |
| 217 to 220 | 75 | 70 | 4 | |
| 221 to 224 | 75 | 71 | 4 | |
| 225 | 75 | 72 | 3 | |
| 226 to 228 | 76 | 72 | 4 | |
| 229 to 230 | 76 | 73 | 3 | |
| 231 | 76 | 73 | 4 | |
| 232 | 77 | 73 | 4 | |
| 233 to 235 | 78 | 74 | 4 | |
| 236 | 78 | 74 | 4 | |
| 237 to 240 | 78 | 75 | 3 | |
| 241 to 244 | 79 | 76 | 3 | |
| 245 | 79 | 77 | 2 | |
| 246 to 248 | 80 | 77 | 3 | |
| 249 to 253 | 80 | 78 | 2 | |
| 254 to 258 | 80 | 79 | 1 | |
| 259 to 263 | 80 | 80 | | 1 |
| 264 to 268 | 80 | 81 | | 2 |
| 269 to 273 | 80 | 82 | | 2 |
| 274 | 80 | 83 | | 3 |
| 275 to 278 | 80 | 83 | | 3 |
| 279 to 283 | 80 | 84 | | 4 |
| 284 to 288 | 80 | 85 | | 5 |
| 289 | 80 | 86 | | 6 |
| 290 to 293 | 80 | 86 | | 6 |
| 294 and over | 80 | 87 | | 7 |

(17) The maximum of class 1 for Houston is reached at from 246 to 248 miles, beyond which no charge is made for distance. The maximum on this class for Galveston, beyond which no charge is made for distance is reached at 284 miles. For the sake of round numbers, these maximum distances will hereafter be referred to as 250 and 300 miles, respectively. The Houston rate, as above set forth, applies as between all common point territory in this state; that is to say, it would be applicable on freight to or from Dallas, Ft. Worth, Waco, and all other places situated in common point territory. The rate to Galveston is applicable to all points in the Galveston differential territory, which includes Velasco, Sabine Pass, Galveston, Texas City, and Bolivar Point. The same principle of rate-making applies to other classification of freights. For example, on class 2, to or from Houston, the rate for 100 miles is 41 cents, to Galveston 32 cents; difference in Galveston's favor, 9 cents; 200 miles, Houston 65 cents, Galveston 60 cents; in Galveston's favor, 5 cents; 300 miles, Houston 72 cents, Galveston 78 cents, against Galveston, 6 cents. Class 3: For 100 miles, Houston 38 cents, Galveston 29 cents; 200 miles, Houston 58 cents, Galveston 54 cents; 300 miles, Houston 60 cents, Galveston 65 cents. Class 4: For 100 miles, Houston 35 cents, Galveston 25 cents; 200 miles, Houston 56 cents, Galveston 50 cents; 300 miles, Houston 58 cents, Galveston 61 cents. Class 5: For 100 miles, Houston 26 cents, Galveston 21 cents; 200 miles, Houston 39 cents, Galveston 36 cents;

300 miles, Houston 44 cents, Galveston 47 cents. And so continuing through classes A, B, C, D, and E. The difference in favor of Galveston at 100 miles is, on classes A and B, 5 cents, on E, 6 cents, on D, 3 cents, and on E, 2 cents. The difference against Galveston, at 300 miles, is on classes A and B, 3 cents, on classes C, D, and E, 2 cents.

(18) Commodity Tariff 1e, Cotton. 100 miles, Houston 40 cents, Galveston 29 cents: 160 miles, 49 cents for both Houston and Galveston; this is the maximum distance for which freight is charged on cotton to Houston; 209 miles and over, Galveston 55 cents, Houston, for this and all other distances in common point territory, remaining at 49 cents. Other commodity tariffs complained of are constructed on the same principle. This method of constructing tariff rates prevails as to all railroads in this state, except the St. Louis, Brownsville & Mexico Railway, whether the haul be over one or more lines; the modifications where the haul is over two or more lines not affecting the principle involved.

We adopt the following findings of fact made by the trial court in reference to the pleas of res adjudicata, limitation, etc.

"(19) All of the orders, rules, and regulations complained of by plaintiffs were adopted and promulgated more than four years before the filing of this suit, except one, to wit: ......

"(20) That on the ——— day of January, 1895, W. F. Ladd & Co., as plaintiffs, filed suit in the district court of Travis county, Tex., against the Railroad Commission of Texas, as defendant, and subsequently filed an amended petition in said cause, averring the matters substantially as set out by the defendants in paragraph 4 of their answer, which said paragraph, in so far as it sets out the issues made by plaintiffs in their said petition, is here adopted and made a part hereof. That on the 6th day of June, 1895, the Railroad Commission, the defendant in said suit, filed its second amended original answer, which was an answer to the amended original petition of plaintiffs filed on that day, and therein presented a general demurrer and general denial, as well as a number of matters in the way of a special answer to said amended petition, denying the unjust discrimination charged in said petition against Galveston, and setting forth the facts which defendants alleged justified the Railroad Commission in establishing the differential of 6 cents on cotton therein complained of. That said cause was tried in said district court of Travis county on the 20th day of June, 1895, and judgment rendered, denying to plaintiffs the relief prayed for in their petition, and entering judgment in favor of defendants. That no appeal was taken from said judgment; that said judgment was a final judgment, and has not been reversed, vacated, or appealed from.

"(21) I find that the plaintiffs herein, and the city of Galveston and the inhabitants thereof, have protested against the system of differentials complained of by plaintiffs in this cause from the first promulgation thereof down to the present time, and have sought, by requests and appeals to the Railroad Commission, by petitions to the Legislature, and practically continuous verbal and written protests to the Railroad Commission, made by different citizens, commercial concerns, and organized bodies in the city of Galveston, to secure the abrogation of said system of rates.

"(22) I find that since the rendition of the Ladd judgment, the cotton crop of the state has vastly increased; the territory within which such cotton crop is grown is much larger now than it was at the date of said judgment; that the growth of cotton has been extended throughout the Panhandle and the western and southwestern sections of the state; that at the date of said judgment a large proportion of the cotton raised in the state was hauled out of the state by the railway companies and did not pass through either Houston or Galveston; that the population of the state has increased; manufacturing and commercial interests are vastly larger now than they were at the time mentioned; that on the date of said judgment there were few lines of railroad running into Galveston, the number entering Galveston being now increased, and the territory reached by the railroads now entering Galveston is much larger than that reached by the railroads entering Galveston on the date of the Ladd judgment. That at the date of the Ladd judgment the depth of the channel into Galveston harbor was about 9 feet, whereas it now has a depth of 30 feet, so that vessels of vastly greater capacity enter the port of Galveston, and bring in and take out freight than was possible when such system of rates was established.

"(23) That at the time of the rendition of the judgment in the Ladd Case none of the individual plaintiffs in this action were engaged in business in Galveston; but few of the cotton merchants or cotton factors now doing business in Galveston were engaged in business at such place on said date; many of the people now living in Galveston were minors, incapable of bringing a legal action; there has been a continuous shifting and changing of the population of the city of Galveston; many of the persons now residing therein were on said date, for various reasons, incapable of bringing or appealing from a legal action."

### Conclusions of Law.

Upon the threshold of the legal questions herein involved, we are met by several propositions on the part of appellees, either of which being sustained would render necessary an affirmance of this case, without reference to its merits.

[1] 1. The first of these is that rate-making is a legislative, and not a judicial, func-

tion, and therefore the courts have no power to review rates made by the Commission. To our minds a sufficient answer to this is that this suit was not brought to have the court fix reasonable rates, but to enjoin certain rates fixed by the commission, and alleged to be unreasonable. It is true that making rates is a legislative function, but the determination as to whether or not a rate is unreasonable, or for any reason illegal, is a judicial function. McDuffee v. Railway Co., 52 N. H. 448, 13 Am. Rep. 72.

[2] By virtue of the power conferred upon the Legislature of this state by section 2, art. 10, of the Constitution, it has created the Railroad Commission, and conferred upon it such powers as it "deemed adequate and advisable." Under the act creating the Railroad Commission, it has all the power granted it, but no more. Looking to this act, we find that the Commission has been granted the power "to correct abuses and prevent unjust discrimination and extortion in rates of freight and passenger traffic on different railroads in this state," and "to fix a reasonable rate." Article 4562, R. S.

Did the Legislature intend to make the Commission the final judge as to these matters? Certainly not. Article 4564 provides that the rates established by the Commission shall be "deemed and accepted to be reasonable, fair, and just, *until finally found otherwise in a direct action brought for that purpose.*" Article 4565 expressly provides for the bringing of such suits in the district court of Travis county. In Railway Commission v. Railway Co., 90 Tex. 353, 38 S. W. 755, the Supreme Court of this state, speaking through Mr. Justice (now Chief Justice) Brown, said: "It is claimed by the Atttorney General, on behalf of the Railroad Commission, that the courts have no power under this law to review the action of the Railroad Commission in regard to any of the rates enumerated, unless the complaint shall show that the act complained of amounts to a taking of property without proper compensation, or without due process of law. * * * The law of this state gives the right to any person who may be interested to institute suit * * * to test the decision of any rate, classification, rule, charge, order, act, or regulation adopted by the Commission."

In Railroad Com. v. Weld & Neville, 96 Tex. 403, 73 S. W. 531, the same court, referring to the above case, said: "Upon a re-examination of the question, we are constrained to adhere to our conclusions arrived at in that case, and to hold that the Legislature intended to confer upon the courts the power to determine the question of the reasonableness of rates as they affect the rights of shippers and the railroads, by the same rules that would be applied in determining a like question between other parties."

[3] 2. It is further contended that the pro-hibition against "unjust discrimination" (article 4574) is as to rates made by the railroads, and that as the rates complained of were made by the Railroad Commission the courts cannot enjoin them, unless they are unreasonable per se, "without reference by comparison to benefits or disadvantages received by others." It is true article 4574 says that it shall be unjust discrimination for any "railroad company to charge any person a greater or less compensation for any service rendered or to be rendered by it, than it charges any other person for a like and contemporaneous service." But, inasmuch as the statute contemplates that all rates shall be made by the Commission, and requires railroad companies to charge the rates fixed by the Commission, no more and no less, it seems to us that article simply defines unjust discrimination, and is intended as a limit on the power of the Commission in fixing rates. It sounds unreasonable to say that, while the legislative powers conferred, both by the Constitution itself and by the act creating the Railroad Commission, are expressly declared to be "to correct abuses and prevent unjust discrimination," that the Legislature intended to allow the Commission, not only to permit railroad companies to do that which the statute says they shall not do, but also to compel them so to do, in that they are required, under severe penalties, to charge the rates fixed by the Commission. If such be the letter of the law, it is an apt illustration of the saying: "The letter killeth, but the spirit maketh alive."

We think that such a construction of the statute is within neither the letter nor the spirit of the law. Our construction of this statute is that, in saying that the railroads must charge the rates fixed by the Commission, until the same are set aside in a direct action brought for that purpose, and in also saying that the railroads shall not charge rates which are unjustly discriminatory, it means that the Commission shall not make rates which amount to unjust discrimination, as that term is defined in the statute, and that if it does so such rates are subject to be set aside by the courts, in an action brought for that purpose. Subdivision 3 of article 4574 makes a less charge for a longer than for a shorter haul prima facie unjust discrimination, but provides that the Commission may allow such charge, "provided that no manifest injustice shall be imposed upon any citizen at intermediate points;" but the Commission is nowhere in the statute empowered to allow unjust discrimination in rates prescribed by them, as that term is defined in the first part of said article, or in subdivision 1 thereof. In other words, the Commission is without power to fix rates for a railroad, whereby it is allowed to charge one person "a greater or less compensation for any service rendered by it than it charges, demands, collects, or

receives from any other person, firm, or corporation for doing a like and contemporaneous service," or to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality.

[4] As to what is "a like and contemporaneous service," or what is "undue and unreasonable preference," etc., are questions of fact, the determination of which is confided to the discretion of the Commission, to the extent of making any rate fixed by it a legal rate, until otherwise determined by the courts. Railroad Commission v. Gal. Cham. Com., 51 Tex. Civ. App. 476, 115 S. W. 99.

[5] 3. Appellees further contend that the matters involved in this suit are res adjudicata, by reason of the judgment in the Ladd Case, as appears in the findings of fact Nos. 19–23, supra. This is based on the proposition that the judgment in that case was a judgment in rem. A judgment in rem, as the name implies, is a judgment against a thing as contradistinguished from a judgment against a person, and is binding upon all the world. It is also a judgment in rem when a status has been determined.

[6] The appellees contend that such is the effect of the judgment in the Ladd Case. That is to say, they contend that, inasmuch as that suit was to enjoin the differential as to cotton, it necessarily involved the "system of differentials" between Galveston and Houston, and that said issue cannot be tried in any subsequent suit. By way of illustration, as if when a judgment fixes a status, the case of Harmon v. Auditor, 123 Ill. 122, 13 N. E. 161, 5 Am. St. Rep. 502, was a suit by certain taxpayers to enjoin the collection of certain railway bonds, upon the ground that the election ordering the issuance of said bonds was void. There had been a previous suit by other taxpayers to enjoin the issuance of said bonds upon the same grounds, which had been determined against the plaintiffs in the former suit. It was held that the former judgment was res adjudicata as to the second suit, inasmuch as it had fixed the status of said election. And so, when the probate of a will is contested on the ground of the incapacity of the testator, or undue influence in obtaining the execution of the will, a judgment admitting the will to probate would estop the parties or their privies to such judgment setting up such matters in a subsequent suit for property under such will. But the court trying the Ladd Case had no authority to determine whether or not differentials between Houston and Galveston were proper under all circumstances, nor to determine whether or not the then existing differential on cotton would, for all time, be just and reasonable, and that suit was not brought for the purpose of having it do so. All that was involved in that case was whether or not a differential of 6 cents per 100 pounds on cotton

between said points was reasonable under the circumstances as they then existed, and whether or not such differential was an unjust discrimination as to the plaintiffs in that suit.

[7] "Where two suits seek the same relief, but upon a different state of facts, the adjudication in the one case constitutes no bar to a recovery in another." Mobile County v. Kimbell, 102 U. S. 691, 26 L. Ed. 242. "In a suit between the same parties arising out of the same contract, to collect toll, a judgment in a former suit was held not to be res adjudicata as to a suit to collect toll at a subsequent time, within which the facts determinative of the attitude and rights of the parties may not have been the same." Railway Co. v. Bridge Co., 107 Fed. 787, 46 C. C. A. 639. In order to work an estoppel between the same parties, it must appear that "the question upon which the recovery in the second demand is had has, under identical circumstances, been previously concluded by a former judgment." Werlien v. N. O., 177 U. S. 397, 20 Sup. Ct. 682, 44 L. Ed. 817. An injunction may be granted on additional facts discovered since a former suit, wherein an injunction was denied (Blizzard v. Nosworthy, 50 Ga. 520), and, a fortiori, it may be granted upon facts that did not exist when a former suit was tried. "A given relation of rates between competing towns, fairly equitable at the time of its adoption, may become, through business developments and other changed conditions, severely prejudicial." Daniels v. Railway Co., 6 Interst. Com. R. 459. Appellants alleged and proved material changes in the conditions at Galveston since the Ladd suit was tried.

[8] There is, we think, another sufficient reason why the Railroad Commission should not be heard on its plea of estoppel in this case. Estoppel must be mutual, and a party not bound by a judgment cannot claim that another is estopped by it. Gwynn v. Hamilton, 29 Ala. 236. We do not think it can be plausibly contended that a judgment determining the reasonableness or unreasonableness of a certain rate would be binding on the Commission for all time to come, regardless of changes which might occur, especially in this age, "when we go so fast." If so, the functions of the Commission might, in a short time, be entirely superseded, and that which was intended to be perpetually a useful branch of the government might soon sink into "inocuous desuetude."

[9] 4. Appellees also urge the four-year statute of limitation in bar of appellants' cause of action. This plea must also be denied on, among other grounds, a want of mutuality. A suit against the Railroad Commission is a suit against a branch of the state government, and is, in effect, a suit against the state. Unless otherwise expressed in the statute, limitation does not run against the state. Stanley vs. Schwalby, 85

Tex. 353, 19 S. W. 264; Whatley v. Patton, 10 Tex. Civ. App. 77, 31 S. W. 60; Brown v. Sneed, 77 Tex. 474, 14 S. W. 248; Commissioner v. Johnson, 6 Pa. 139; U. S. v. Williams, 5 McLean, 133, Fed. Cas. No. 16,721; Gibson v. Choteau, 80 U. S. 92, 20 L. Ed. 536. Chief Justice Gibson, in Com. v. Baldwin, 1 Watts, 54, said: "This construction of this salutary principle has been retained, I believe, in all the sister states." The statute does not undertake to bar by limitation any action of the Commission, for which reason it cannot be permitted to plead limitation as to any action taken by it.

[10] For the additional reason that the duty of the Railroad Commission to make and enforce proper rules, and to prevent unjust discrimination, is a continuing duty, we do not think limitation runs in its favor. Hatch v. Railway Co., 50 Hun, 64, 4 N. Y. Supp. 509; Catholic Church v. Railway Co. (C. C.) 41 Fed. 568.

[11] For still another reason suits of this character should not, in our opinion, be barred by the statute of limitation, and that is, they involve the public welfare. It is true that such suits may be brought by a private citizen, moved thereto by his selfish interest; but they must necessarily involve, more or less, the public welfare. In this case the rates attacked affect not only that portion of the public residing in Galveston, but also a majority of the citizens of Texas, residing in more than half of her vast domain. Counsel for appellees, in their able brief, frequently refer to "Galveston's advantage" in her cheap rates within a certain zone, by reason of the differential system, and counsel for appellants frequently refer to "Galveston's disadvantage," by reason of her high rates beyond this zone. But whatever advantages or disadvantages accrue to Galveston by reason of these rates, also, in a large measure, accrue to the majority of the people of Texas, within or without this zone. If a low rate is charged on cotton, the producer of that staple reaps a benefit therefrom; if a high rate is charged, he pays the freight. If the Galveston importer can distribute his goods at cheap rates within a certain zone, the retailer and the consumer should thereby be enabled to purchase such goods at a lower price. If it costs the Galveston importer a high rate to send his goods beyond a certain distance in the interior, the Dallas and Ft. Worth jobber must pay the same rate on goods which he ships through Galveston. Also, as Eastern rates to Texas points are based on the combined seaboard and Texas rates, these rates affect interstate shipments into Texas.

In Stoughton v. Baker, 4 Mass. 528, 3 Am. Dec. 236, the court said: "Every owner of a water mill or dam holds the same on condition, or perhaps under limitation, that a sufficient and reasonable passageway shall be allowed for fish. *This limitation, being for the benefit of the public,* is not extinguishable by inattention or neglect in compelling the owner to comply with it." In this case the dam was erected in 1632; suit was brought in 1805. If the public cannot be deprived of its right to have fish go up a stream, after a lapse of 172 years, surely the public ought not to be deprived of its right to have reasonable and just rates made and enforced after neglecting to do so for a period of four years.

[12] 5. It is further urged by appellees that to change the present system of basing rates on Houston would be an interference with the vested rights of the business men of that city, inasmuch as this system has prevailed for such a great length of time, and they have invested a great deal of money on the faith of its continuance. This would be a very strong argument against any change in rates so as to unjustly discriminate against Houston; but it is not a sound argument in favor of the maintenance of a rate, if any such there be, that unjustly discriminates against Galveston. The doctrine of vested rights can have but a limited application in governmental regulations. Mr. Cooley, in his work on Constitutional Limitations (7th Ed.) § 509, says: "In organized society every man holds his possessions and looks forward to all he hopes for, through the aid and under the protection of the laws, but as changing circumstances and public opinion, as well as other reasons affecting public policy, are all the while calling for changes in the laws, and these changes must influence, more or less, the value and stability of private possessions, and strengthen or destroy well-founded hopes, and as the power to make very many of them could not be disputed without denying the right of the political community to prosper and advance, it is obvious that many rights, privileges, and exemptions which usually pertain to ownership under a particular state of the law, and many reasonable expectations, cannot be regarded as vested rights in any lawful sense."

The citizens of Houston are conclusively presumed to know that the legislative power of making rates has been conferred upon the Railroad Commission, and that it may change existing rates at any time, subject to the limitation that any new rate or system which it might adopt must not be unreasonable or unjust to Houston; and that any rate heretofore established was liable to be enjoined, if the same could be shown to be unreasonable or unjust to any other place. And so it is plain that the reasonableness and justness of the rates complained of are the only considerations which should, or legally can, influence this court in its decisions herein.

[13] 6. The appellees, in effect, concede that jurisdiction is conferred upon this court by the Railroad Commission act to pass upon the reasonableness of rates, but insist that in doing so we must be governed by the com-

mon law as to the meaning of this expression. They insist that at common law an unreasonable rate meant one that was unreasonable per se, and that no one could be heard to complain that he was unjustly discriminated against, in that another was charged less for a like service, if he was not charged too much. We do not so understand the common law to be. "In Baxendale v. Railway Co., 4 C. B. (N. S.) 63, two of the judges intimate a notion that unequal rates would not be contrary to common law, but the same was a mere dictum, foreign to the question at issue." Messenger v. Railway Co., 37 N. J. Law, 535, 18 Am. Rep. 754. "Although authorities may be found to the effect that the common law required only that the rates be reasonable, and did not require them to be equal to all, the better authorities regard the discrimination principle merely as the outgrowth of the common-law idea of the function of the common carrier." Drinkard on Int. St. Com. Act, § 11. Mr. Justice Brown, in discussing the common-law doctrine, in Interstate Commerce Commission v. Railway Co., 145 U. S. 276, 12 Sup. Ct. 847, 36 L. Ed. 703, said: "The weight of authority in this country was in favor of equality of charge in favor of all persons for similar services." "Transportation by a common carrier is necessarily open to the public on equal and reasonable terms." Audenried v. Railway Co., 68 Pa. 380, 8 Am. Rep. 195, "The very definition of a common carrier excludes the right to give unequal preference." Express Co. v. Railway Co., 57 Me. 188, 2 Am. Rep. 31. "A service or price that would otherwise be reasonable may be made unreasonable by an unreasonable discrimination." McDuffee v. Railway Co., 52 N. H. 450. "Another prefectly well-settled rule of the common law in regard to common carriers is that they shall not exercise any unjust and injurious discrimination." Railway v. People, 67 Ill. 17, 16 Am. Rep. 599. This applies between different localities, as well as between individuals. Railway Co. v. People, 67 Ill. 19, 16 Am. Rep. 599. The decision of our Supreme Court, in Railway Co. v. Rust & Dinkins, 58 Tex. 111, is in accord with these authorities.

7. Before attempting to apply the law as we understand it to the facts of this case, we will state some general and well-settled rules as to rate-making:

[14] (a) The unit of the cost of service in moving freight is the cost per ton per mile.

[15] (b) Distance is the primary basis of rate-making; that is to say, other things being equal, the rate charged should be in proportion to the length of the haul. "Circumstances not being substantially different, distance should control." Gro. Co. v. Railway Co., 12 Interst. Com. R. 229. "In the absence of other influential circumstances, distance may fairly be considered a controlling element in fixing reasonable rates." Hill & Co. v. Railway Co., 6 Interst. Com.

R. 373. To the same effect are Commercial Club v. Railway, 6 Interst. Com. R. 674; Freight Bureau v. Railway Co., 7 Interst. Com. R. 181; Machine Shop v. Railway Co., 6 Interst. Com. R. 361; Drinkard on Interstate Com. vol. 1, § 117.

(c) The cost per ton per mile decreases as the length of the haul increases. "It is as nearly settled as anything relating to railroads can be that, under like conditions, freight can be carried long distances at rates proportionately lower than short distances." Cotton Ex. v. Railway Co., 2 Interst. Com. R. 385. This very familiar rule has become axiomatic. Farrar v. Railway Co., 1 Interst. Com. R. 600.

[16] (d) An apparent exception to the influence of mileage in rate-making, and also as to the rule in reference to natural advantages hereinafter stated, is the rule as to "blanket" or "group" rates. Some inequality is inherent in this system. They must, however, be made with the view to as little inequality as possible, and, if unjustly discriminatory, they are illegal. We cite the following cases as sustaining the rule above stated: Lumber & Coal Co. v. Railway Co., 16 Interst. Com. R. 334; Lumber & Coal Co. v. Railway Co., 9 Interst. Com. R. 31; Wilhoit v. Railway Co., 12 Interst. Com. R. 140; Dosel-Boettcher Co. v. Railway Co., 12 Interst. Com. R. 222; Traffic Bureau v. Railway Co., 1 Interst. Com. R. 173; Supply Co. v. Railway Co., 13 Interst. Com. R. 56; Mfg. Union v. Railway Co., 1 Interst. Com. R. 631; and Mitchell v. Railway Co., 12 Interst. Com. R. 325.

[17] (e) Density of traffic is one of the important factors in rate-making. This rule is not only sustained by authority, but was proven by the uncontradicted testimony of the experts in this case.

[18] (f) Competition is an important, and frequently a controlling, factor in rate-making. In Johnson v. Railway Co., 12 Interst. Com. R. 56, it was said that railroads must be allowed to meet competition, or they must withdraw from business. In Ex parte Koehler (C. C.) 25 Fed. 73, where a railroad was forced to make a very low rate in order to meet water competition, the court said that in such cases the railroad company must take what it can get, or abandon the field and let its road go to rust. The experts in this case are at agreement on this point also.

[19] (g) It is not permissible, in order to equalize commercial advantages, to deprive any place of its natural advantages. "That rates should be fixed in inverse proportion to the natural advantages of competing towns with the view of equalizing commercial advantages, as they are sometimes described, is a proposition unsupported by law and quite at variance with every consideration of justice." Board of Trade v. Railway Co., 5 Interst. Com. R. 293; Railroad Commission v. Chamber of Commerce, 51 Tex. Civ. App. 476, 115 S. W. 99. "A city is entitled to the

benefits arising from its location, and the fact that it enjoys exceptional advantages in one respect is no reason why it should be subjected to disadvantages in another respect." Freight Bureau v. Railway Co., 7 Interst. Com. R. 180. "Commissioners have no right to disregard distance and natural advantages in order to bring about commercial equality." Commercial Club v. Railway Co., 6 Interst. Com. R. 195. For other decisions to this effect, see Interstate Commerce Commission v. Railway Co., 145 U. S. 263, 12 Sup. Ct. 844, 36 L. Ed. 706; Eau Claire v. Railway Co., 4 Interst. Com. R. 77; Interstate Commerce Commission v. Railway Co. (C. C.) 73 Fed. 409. In Railroad Commission v. Chamber of Commerce, supra, this court said: "We do not believe that it was the intention of the Legislature, in creating the Railroad Commission and vesting it with power to make and regulate rates and charges, to confer upon that body authority to make discriminations for the purpose of offsetting natural and other advantages possessed by localities and individuals." We have had no occasion to change our opinion in this regard.

(h) There are some other rules in regard to rate-making which we do not deem it necessary to discuss, inasmuch as they are not involved in this case. Among these are the value of the service to the shipper; otherwise stated, what the traffic will bear, and a reasonable revenue to the railroads.

8. Cost of construction and operation are incidentally involved in the issues of "like service" and "discrimination." No testimony was given as to what would be a reasonable rate from the standpoint of revenue to the railroads. The only offer of evidence on this line was in the following question propounded to Commissioner Colquitt: "Please state from your knowledge as railroad commissioner whether, in your opinion, having proper regard for the revenues of the railroad companies, 49 cents per 100 pounds would be a sufficient charge for transporting cotton into Galveston from any point beyond 160 miles?" This was objected to on the ground that the witness could not express the opinion of the Commission, or in any wise bind or affect it by his individual utterance or opinion upon this question, and upon the further ground that no evidence had been offered by the defendants bearing upon the question of what would be a reasonable rate from the standpoint of revenues to the railway companies; and also upon the ground that the reasonableness of the rate as compensation to the railroads was not made an issue by the plaintiffs' pleading. These objections were sustained by the court. Appellants' bill of exception shows that they expected the witness to answer as follows: "I think 49 cents is enough to charge, with or without water transportation, between Houston and Galveston."

[20] Appellants' petition alleges: "That there is nothing in the local conditions affecting the shipment of cotton into Galveston, or in the cost of such shipments requiring, justifying or excusing the charging of any greater freight rate than applies between other points in Texas, for similar distances, and that the sole purpose, object, and excuse of the Railroad Commission of Texas in maintaining and requiring the higher freight rates complained of to Galveston, over and above the freight rates required to be charged in such shipments to Houston, is to deprive Galveston, and the persons engaged in the cotton business at Galveston, of Galveston's natural advantage by reason of its being a deepwater port, and to arbitrarily put Houston on a plane of commercial equality in the business of handling cotton, with Galveston, and to arbitrarily maintain Houston as a cotton market." We think these allegations are sufficient to render the testimony offered relevant to a material issue in the case.

[21] We do not think there is any force in the objection that the witness, as a member of the Commission, could not bind the Commission as a body, by his individual opinion. This testimony was not offered as an admission on the part of the Railroad Commission as a body, but as the testimony of an expert, who had shown himself to be such, and who had become an expert in such matters by reason of his long experience as a railroad commissioner. As to the ground that no evidence had been offered by the defendants on the issue as to the reasonableness of the rate as compensation to the railroads, this would be tenable only on the theory that the burden was on the defendants as to this issue.

However, as the appellants were permitted to and did produce evidence as to the relative cost of construction and operation of railroads between Houston and Galveston and other parts of the state, and as the evidence showed that 49 cents was the rate on cotton to Houston for all distances over 160 miles, and that the rate for a like distance to Galveston was 55 cents, and as this case was tried by the court without a jury, we would not deem the error in refusing to admit this testimony sufficient to justify a reversal of this case, if the judgment was otherwise sustained by the law and the evidence.

[22] 9. In previous portions of this opinion, we have discussed the attitude of the common law with reference to unjust discriminations, and the meaning of the term "reasonable rates" with reference to such discriminations. We have also cited a number of decisions construing the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]). These decisions are peculiarly applicable to our statute with reference to the Railroad Commission, as are also the English decisions with reference to acts of Parliament on this subject, a number of which we have examined and found in har-

mony with the decisions hereinbefore cited. The interstate commerce act, in its essential features, is modeled on the English railway act of 1845 (8 & 9 Vict. c. 20) and the English railway and canal act of 1854 (17 & 18 Vict. c. 31) as modified by section 11 of the act of 1873 (36 & 37 Vict. c. 48). Our railroad commission act (Sayles' Ann. Civ. St. 1897, arts. 4561–4584), in its most material parts, copies, to a great extent, the exact words of sections 2, 3, and 4 of the interstate commerce act. What was said in the case of McDuffee v. Railway Co., 52 N. H. 453, 454, 13 Am. Rep. 72, in reference to the difficulty of properly deciding a case of this magnitude, is peculiarly applicable here. But the court in that case, dealing with it under the common law, said: "But such difficulty as there may be will arise from the breadth of the inquiry, the intricate nature of the matter to be investigated, the circumstantial character of the evidence to be weighed, and the application of the legal rules to the facts, and not from any want of clearness and certainty in the general principle of the common law applicable to the subject." If this was true under the common law, we think it is equally true under our statute.

Neither the English statutes, nor the interstate commerce act, nor our railroad commission act forbids all discrimination. The discriminations prohibited by the English acts are those which are "undue and unreasonable"; the test being as to whether "a like service is performed, under the same circumstances." The test under the interstate commerce act is as to whether the service is "a like and contemporaneous service, under substantially similar circumstances and conditions," and as to whether or not "any undue or unreasonable preference or advantage" is given to any particular firm, corporation, or locality, or whether any one is subjected to "any undue or unreasonable prejudice or disadvantage in any respect whatever." The test under our statute is whether the service is "a like and contemporaneous service," or whether "any undue or unreasonable prejudice or advantage is given to any particular person, firm, corporation, or locality," or whether or not any particular description of traffic is subjected to "any undue or unreasonable prejudice, delay, or disadvantage in any respect whatsoever." These are but crystalizations of the common law on this subject, as laid down by the better authorities; and, to our minds, leave no doubt as to what the law is under our statute.

[23] 10. We are reminded by appellees that article 4566, R. S., provides that: "In all trials under the foregoing article the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulations, orders, classifications, acts or charges complained of are unreasonable and unjust to it or to them." If we are correct in our view of the law as hereinbefore stated, a discrimination in a freight rate against any person or locality for "a like and contemporaneous service" is "unreasonable and unjust to it or them." As to the quantum of proof, there is practically no contradiction in any of the evidence herein as to the facts in this case; the only room for difference is as to the deductions to be drawn from the facts proven.

[24] 11. The nineteenth and twenty-second findings of fact by the trial court, and upon which its conclusions of law and the judgment herein was based, are as follows:

"(19) Taking into consideration findings Nos. ——, I am unable to compare with accuracy the cost to the railways of carrying freight between Galveston and Houston with the cost, including all services, for the same service on the average 50 miles in the interior; however, I am inclined to the opinion that the actual cost, under present conditions, is slightly greater between Houston and Galveston than for the same distance in the interior."

"(22) Taking into consideration all of the above findings, I conclude that the service of the railways between Houston and Galveston is not a like service as that for the same distance in the interior, and that some greater compensation to the railroads operating between Houston and Galveston would be justified."

What are the findings Nos. —— referred to in finding No. 19, which inclined the trial court to the opinion that the cost of hauling freight was slightly greater between Houston and Galveston than for a like distance in the interior? The only findings previous to No. 19 which in any degree bear upon this issue under present conditions are Nos. 11, 13, 14, 15, 16, 17, and 18, which are as follows:

"(11) All the other railroads entering Galveston cross Galveston Bay on a bridge about two miles in length. Other bridges have been used, but have been washed away by storms, and only the present bridge was rebuilt at a cost of $145,000. For the use of this bridge, the roads pay an interest rental and a proportion of the cost of maintenance. The present bridge is a standard wooden bridge of its kind and is adequate to carry the traffic over it, with the exception that its use by the several roads causes delay in traffic and consequent expense. The bridge, however, is not considered a permanent structure, in that it is a wooden bridge, and is subject to damage or destruction by storms."

"(13) On the railroad crossings between Houston and Galveston, it is necessary to operate a number of interlocking devices, ranging in initial cost from $4,500 to $10,000 or $12,500 each, and costing from $150 to $250 per month each for maintenance and operation. Two drawbridges are also in use, one near Houston and one on the Galveston bridge. With the exception of drawbridges at the Texas & New Orleans bridges over the Trinity and Neches rivers, it is not shown that drawbridges are necessary else-

where in the state. It is also shown that there are a number of interlocking devices on the Texas & New Orleans, on the divisions east and west of Houston, and that interlocking devices are in use in Houston, Dallas, and all large railroad centers.

"(14) The expense paid by railroads for labor for operating trains is greater per mile between Houston and Galveston, for the reason that Houston is a division point, the Houston-Galveston division being approximately 50 miles in length; train crews are paid on a basis of 100 miles; the compensation for the shorter run being the same as for 100 miles. The cost of one crew for 100 miles is $22.83, the same cost that is incurred by the railroads for a crew operating between Houston and Galveston.

"(15) The absence of grades, however, makes it possible for the railroads to handle about double the amount of freight between Houston and Galveston with a single crew as can be ordinarily handled with the same crew in the interior.

"(16) The expense of switching and handling cars at Galveston, not including the terminal railway charges on expert traffic, is 18 cents per car at Galveston and 15 cents per car at Houston, and less at interior points; at small division points the cost being from 1 to 2 cents.

"(17) The cost of coal for operation of the average train between Houston and Galveston, considering the distance as 50 miles, is $20; while to carry the same amount of freight for like distance in the interior would cost $23.

"(18) The country between Houston and Galveston is low and level, and, on account of moisture, character of the soil, and difficult drainage, the roadbeds of the railways are more expensive to maintain than for the same distances in the interior, where the country is rolling."

Findings Nos. 20 and 21 are as follows:

"(20) While it is shown by the evidence that on the Texas & New Orleans railroad, between Houston and Beaumont, and between Houston and Glidden, the railroads carry more tons of freight per mile of road during a year than is carried per mile of road between Houston and Galveston, yet I conclude on the whole facts that the amount of freight per mile of road carried in a year is greater between Houston and Galveston than is carried over the average 50 miles of railroad in the interior.

"(21) On the other hand, the cars engaged in carrying cotton and other export traffic to Galveston largely make the return trip empty; the proportion of cars hauled back empty from Galveston being larger than from Houston and other interior points."

Finding No. 22 should perhaps be construed to refer also to No. 12, which, while relating to a future condition, might properly be considered in deciding this case. No. 12 is as follows:

"(12) There is at present under construction a causeway over the bay which will be used by all of the railroads, except the Gulf & Interstate. The Gulf, Colorado & Santa Fé, the Galveston, Houston & Henderson, and the Galveston, Harrisburg & San Antonio, are under contract to pay one-half of the cost; the total expense of these three railroads for their one-half of cost of construction and for completing their tracks across the causeway will be $800,000."

As to No. 11, the testimony of Mr. Van Vleck, the expert witness for the appellees, shows that the bridge is about two miles long, and is used by six railroads, which makes it equivalent to 12 miles of track for a single road. As this bridge cost $145,000, this is equivalent to a cost of $12,083 per mile to each road, which is shown to be less than the average cost of railroad track in this state.

As to No. 13, the court finds that interlocking devices are in use elsewhere, and while there are no drawbridges elsewhere, except as shown in the finding, the evidence shows that the bridges between Houston and Galveston are far less expensive than in some other portions of the state. Mr. Van Vleck testified: "I know, as a railroad man, that these interlocking expenses exist and accrue at nearly all the railroad centers in Texas, and I have no knowledge of their being considered as an element in rate to any of these localities."

As to Nos. 14, 15, and 17, the facts therein found are shown, when taken together, to affect the cost between Houston and Galveston as follows: One train moves between Houston and Galveston, 58 miles, 781 tons at a total cost of $50.46, or .011 cents per ton per mile; for 100 miles away from the coast country it requires two trains to pull 781 tons, at a total cost of $112.52, or .014 cents per ton per mile.

[25] As to No. 16, the difference of 3 cents per car may be treated under the head of de minimis lex non curat. Slight difference in a single item of cost would not justify a difference in rate. Carr v. Railway Co., 9 Interst. Com. Com'n R. 11.

No. 18 does not indicate what is the additional expense in maintaining the roadbed by reason of the moisture and lack of drainage, and the evidence as to this is equally vague.

Nos. 20 and 21 find that the freight per mile is greater between Houston and Galveston than over the average 50 miles of road in the interior. We think the evidence indicates that the freight per mile between Houston and Galveston is many times greater than that over the average 50 miles in Texas. This is a proper element for the reduction of the freight rate. On the other hand, the finding that the back haul of empty cars is larger between Houston and Galveston is a proper element for the increase of rates. The evidence shows that

Galveston's exports very greatly exceed her imports, which necessarily means a large back haul of empty cars, but there is nothing in the evidence to show what proportion of these empty cars stop at Houston, and what proportion of them are carried to the interior. Besides, this condition does not necessarily indicate that it should be considered as an element for increasing the rates, as this condition might be overcome by allowing lower rates on freight into the interior, by way of increasing imports to the port of Galveston.

As to the causeway mentioned in No. 12, this, when completed, will be about two miles long, and will cost about $800,000. It will be used by six roads, and will be equivalent to 12 miles of track, or $66,666 per mile. Doubtless there are many miles of road in Texas that cost as much. There are single bridges in the interior that cost more than this.

12. In the twenty-second finding of fact, which is but a deduction of fact from other facts found, the trial court concludes that some greater compensation to railroads operating between Houston and Galveston would be justified. In this we do not concur. But if this conclusion was correct, we do not see how it would aid in upholding the rates here attacked. In fact, on all freights within certain fixed distances from Galveston, varying from 148 miles on cotton to 258 miles on class No. 1, a *less*, instead of a greater, compensation is allowed under the tariffs fixed by the Commission.

The theory of the Commission, as evidenced by its rates, seems to be that by reason of the water competition, on all freights within certain distances from Galveston, the rate should be less than elsewhere for like distances, and that to offset this advantage to Galveston there should be charged on freight to Galveston for the first 50 miles, beyond what is fixed as maximum distances for Houston, and other places in common point territory, an additional rate equal to the differentials fixed by the Commission, while no charge is made for such additional 50 miles from Houston or places in common point territory. Thus we see that the effect of the Commission rates is that the railroads get less in all cases for the haul between Houston and Galveston than for a like distance in other portions of the state. This is not only proper, but is rendered necessary by reason of the water competition. But we also see that the effect of this method of rate-making is to fix a higher rate for freight to or from Galveston than is charged for like hauls for like distances in other parts of the state. This will clearly appear by reference to the tables hereinabove set out.

As a method of equalizing the commercial advantages between Houston and Galveston, taking into consideration Galveston's advantage by reason of having a waterway for 50 miles into the interior, this method of rate-making might be effectual. Whether, on the whole, Galveston's said waterway is an advantage or disadvantage to her, under this system of rate-making would depend upon her ability to do more business within or without the maximum zone thus established. But, as the law does not permit rates to be made with the view of equalizing commercial advantages between rivals, so as to overcome natural advantages possessed by one of them, this inquiry is not pertinent to any issue involved in this case.

13. Appellees assert that "the differential has absolutely nothing to do with the rate." The argument is plausible as applied to cotton, inasmuch as all cotton ultimately goes to Galveston, and none of it is shipped back into the interior; but it is without force as to other commodities. Appellees say: "The Commission could just as readily say that the rate to Galveston should be 55 cents, and leave Houston, as it has left other towns, concentrating privileges under the 55-cent rate, as to make the system of rates which it has made." Then why not do so? Houston concedes it; Galveston asks it; and the law demands it.

[26] 14. Commodity tariff No. 1e compels cotton men at Galveston to pay on cotton concentrated there about 12½ cents per bale for delivery to shipside, in addition to the 55-cent rate; while the railroads are compelled to pay all expenses of delivery to shipside on cotton concentrated at Houston out of the 55-cent rate. This gives an undue and unreasonable preference and advantage to cotton men in Houston over cotton men in Galveston. This tariff had been suspended when this case was tried. It should not again be put in force.

15. We see no practical difference as to rate-making between the Gulf, Colorado & Santa Fé Railway, and the St. Louis Brownsville & Mexico Railway, the rates on which were involved in Railroad Commission v. Galveston Chamber of Commerce, reported in 51 Tex. Civ. App. 476, 115 S. W. 94. As to the rates complained of herein, the Gulf, Colorado & Santa Fé may be treated as not entering Houston at all. No freight over the main line of this road passes through Houston, and we see no reason why its rates to Galveston should be based on Houston, nor why it should be compelled to charge a higher rate to Galveston over certain distances, than it is permitted to charge to other places on like freight for like distances.

Appellees say that if this was not the case this road would get all of the cotton at competing points in its territory beyond 160 miles from Galveston. This is reversing the rule that competition may justify a reduction in rates, and requires an unreasonably high rate in order to avoid competition. We say unreasonably high, on the supposition

that the Commission has fixed a reasonable rate for this road over its line in common point territory, nothing being shown as to physical conditions or operating expenses which would justify an increased rate to Galveston. This objection, if such it be, could be obviated by the Commission under its power to fix different rates for different points on the same road. .

[27, 28] 16. As to the roads entering Galveston through Houston, the undisputed fact is that they are required to charge a higher rate to Galveston for all freight over certain distances, which varies with different commodities, than they are permitted to charge for the same character of freight for like distances to Houston, and between other points in common point territory. This is not permissible as a matter of law, unless there are circumstances which justify it. We will here make a brief resumé of the circumstances which justify discrimination in freight rates. Until the contrary appears, we must assume that the rates made by the Commission, and applicable to the greater portion of Texas, are reasonable. What conditions exist that justify a higher rate to Galveston?

[29] (a) There is no complaint as to established rates from the standpoint of revenue to the railroads; hence we assume that they are sufficiently high, if the present average is maintained, to meet this requirement. If abolishing the differential, as now maintained, should result in such lowering of rates as to make the same unjust to the carriers, it is within the power of the Commission to so regulate rates as to give them reasonable compensation, without unjust discrimination against any person or place, and in such event it would be their duty so to do. "The servant is worthy of his hire," though the servant be a railroad corporation.

[30] (b) The facts, as shown by the record, do not justify an increased rate between Houston and Galveston by reason of the cost of construction, maintenance, or operation. There is no contention that the railroads under the present tariffs are carrying freight between Houston and Galveston at a loss. If such was the fact, the rates between these points should be increased. Such fact, if it existed, would not justify a discrimination against Galveston in hauls over maximum distances.

(c) The rule that the rate should decrease as the distance increases is applied on freight to Houston, so that, when certain distances are reached, no additional charge is made for any additional distance. This rule is also applied to Galveston freight up to the same distances from Galveston. But, for the first 50 miles in the interior beyond these points, freight to or from Galveston is charged an additional amount, equal to the differential.

(d) Density of traffic may justify lower rates. But here the higher rate is charged to the point having the greatest amount of traffic.

(e) Competition may demand lower rates. But Galveston, which has water competition for 50 miles in the interior, is charged the higher rates on hauls coming in competition, for that distance, with water transportation.

(f) The statute permits the Commission to make group rates, and it has done so as to common point territory; but, without cause, so far as we can see, it has excluded Galveston and other Texas seaports from the group.

(g) The back haul of empty cars might demand lower rates into the interior, and thereby increase the imports to Galveston; but, at least until this is tried, such condition can furnish no excuse for higher rates out of Galveston.

(h) It is not permissible to charge a place having natural advantages a higher rate in order to equalize its commercial advantages with a rival. Galveston has the natural advantage of a waterway for 50 miles into the interior. Not only is this ignored by the Commission rates, as to all territory beyond certain distances, but Galveston is charged a greater rate to and from this territory than is charged for a like distance to Houston to or from the same territory over the same lines. A careful examination of the record in this case has convinced us that there is no excuse for charging a higher rate to Galveston for any distance than to Houston for a like distance, except to overcome Galveston's natural advantage in its water rates.

17. As no facts are apparent of record that would justify a lower rate to Texas City for any character of freight for any distance than for the same character of freight for like distances to Galveston, we conclude that no such lower rate should be allowed.

18. We are reminded by attorneys for appellees that we should hesitate to interfere with the differential system in this state, for the reasons: It was adopted by the railroads many years ago, presumably for good reasons; the Railroad Commission, with the exception of a brief period at the beginning of its existence, has maintained this system; and for the further reason that "it is no reflection on the courts, which, in the nature of things, have not had the requisite knowledge, training, experience, and time to deal with the subject, to say that they cannot be supposed to be able to handle the entire rate adjustment in the state as satisfactorily as the Commission, devoting its whole time to the question."

We are not insensible of the force of these suggestions. In view of the great responsibilities that rest upon courts, they, like the needle, should tremble into place; but the law, as best they understand it, and the facts proven, should ever be their polar star. The Legislature which created the Railroad Com-

mission, it may be in its unwisdom, has given the courts authority to review the rates by that body, and, when a case is presented in the manner required by law, they cannot escape doing so. In disagreeing with the Railroad Commission, we are not presumptuously setting our judgment against theirs. They have discharged their duty as they have seen it; but we must decide according to our own judgment, and not another's.

That the differential system is of long standing in this state is true, and this is not without significance favorable to its continuance. That which has survived usually does so because it is fittest to survive. But it is also true that wrong is wrong, though it be hoary with age. It is also true that the differential was inaugerated by the railroad managers, who presumably understood their business. But railroad managers do not always take the public into consideration, when to do so might conflict with the interest of their companies. It is for this reason that rate-making was taken out of their hands and put into the hands of the Commission, which, in the discharge of a public function, must make such rates as will not unjustly discriminate against any person or place, and in doing this they are bound by the rules of law with reference to rate-making. As regards the origin of this system, the trial court found as follows: "The system of making rates by imposing a differential, or increased, rate on Galveston as against Houston, on the same commodities, in the same amount, and for equal distance, was originated by the railroads at a time when their termini were at Houston; at that time they were largely hauling their products to northern and eastern points." It was manifestly to their interest to haul products to the more distant markets at New Orleans and St. Louis, rather than to the nearby port at Galveston.

However, the responsibility is not upon us in this case "to handle the entire rate adjustment in the state," but only to pass upon certain rates applicable to a limited portion of the state, known as the Galveston differential territory, and to leave it to the able Railroad Commission to make whatever readjustment they may deem necessary by reason of our opinion herein.

While we do not seek to minimize our responsibility in this case, we feel a satisfaction in the knowledge that there is in this state a Supreme Court, composed of judges whose profound learning and conscientious discharge of duty have added luster to the exalted position to which they have been called, to whom appellees can apply to correct our error, if such we have made.

For the reasons herein given, the judgment of the trial court is reversed and here rendered for appellants.

Reversed and rendered.